Paul HERNANDEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–04–00768–CR.

Court of Appeals of Texas,
San Antonio.

April 12, 2006.

Discretionary Review Refused
July 26, 2006.

Keith S. Hampton, Austin, for appellant.

Daniel Thornberry, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

## OPINION ON REHEARING

Opinion by CATHERINE STONE, Justice.

On February 22, 2006, we issued an opinion and judgment affirming the trial court's judgment. Appellant, Paul Hernandez, has filed a motion for rehearing. We deny appellant's motion; however, we withdraw our opinion and judgment of February 22, 2006, and substitute this opinion and judgment in their stead.

### BACKGROUND

On December 7, 2001, Paul Hernandez went to Elizabeth Tate's Bexar County, Texas residence with two other men, Ricky Alderete and Angel Vasquez, to steal the elderly woman's new Lincoln Town Car. Tate sustained fatal injuries during the crime. Hernandez and his cohorts eventually disposed of Tate's body in an Atascosa County, Texas cemetery, where they burned her body with gasoline. Hernandez was charged with capital murder after Tate's charred remains were discovered by authorities.

After a jury trial, Hernandez was found guilty of the alleged offense and sentenced to life in prison. Hernandez appeals his conviction and life sentence, complaining in twelve issues that: (1) the evidence is legally insufficient to support his conviction; (2) the evidence is legally insufficient to prove venue in Bexar County, Texas; (3) the trial court erred in failing to instruct the jury on the defense of mistake of fact; (4) the trial court erred in instructing the jury on the law of parties; and (5) he was denied effective assistance of counsel at trial.

### SUFFICIENCY OF THE EVIDENCE

In issues one, two, three, four, five, six, and twelve, Hernandez essentially contends the evidence is legally insufficient to support his conviction.[1] When a party attacks the legal sufficiency of the evidence, we view the evidence in a light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Mason v. State*, 905 S.W.2d 570, 574 (Tex.Crim.App. 1995). If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm the trial court's judgment. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex.Crim. App.1997). "Furthermore, when the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories." *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App.2004).

We must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inad-

1. Hernandez does not challenge the factual sufficiency of the evidence.

missible during our review. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999). Although our analysis considers all the evidence presented at trial, we may not re-evaluate the weight and credibility of the record evidence and substitute our judgment for that of the jury. *Id.; King v. State*, 29 S.W.3d 556, 562 (Tex.Crim. App.2000). The standard for reviewing a challenge to the legal sufficiency of the evidence is the same for both direct and circumstantial evidence cases. *Sutherlin v. State*, 682 S.W.2d 546, 548–49 (Tex. Crim.App.1984).

A person commits capital murder if he intentionally or knowingly causes the death of an individual and intentionally commits the murder in the course of committing or attempting to commit, among other things, burglary or robbery. TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003), § 19.03(a)(2) (Vernon 2003). Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a) (Vernon 2003). A person is "criminally responsible" for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2) (Vernon 2003). A person is also "criminally responsible" for an offense committed by the conduct of another if, "in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy." *Id.* § 7.02(b).

■ Evidence is sufficient to convict under the law of parties where the accused is physically present at the commission of the offense and encourages its commission by words or other agreement. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex.Crim.App. 1994). In determining whether an accused participated as a party, the fact finder may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the accused that show an understanding and common design to commit the offense. *Id.* Further, circumstantial evidence may be used to prove party status. *Id.*

The jury was instructed in this case that it could find Hernandez guilty of capital murder in any of three different ways: (1) as a principal; (2) as a party under Penal Code section 7.02(a)(2); or (3) as a co-conspirator under Penal Code section 7.02(b). The jury in this case returned a general verdict; therefore, if the evidence is sufficient to support a guilty finding under any of the allegations submitted, we must uphold the jury's verdict.

At trial, Jason Flores, one of Tate's neighbors at the Indian Hills Mobile Home Park, testified that Alderete resided with him at the time of Tate's death. He stated that Vasquez also resided at the Indian Hills Mobile Home Park. Flores stated that after he returned from cashing his paycheck on the evening of December 7, 2001, Alderete drove him to an apartment complex to pick up a vehicle that was in Alderete's possession. Flores testified that the vehicle was a 2001 Lincoln Town Car, which he intended to help Alderete sell.

According to Flores, he was aware that Alderete had murdered Tate to get the

Lincoln Town Car.[2] Flores stated Alderete gave him the keys to the vehicle so that Flores could drive the car back to the mobile home park. Flores testified he abandoned Tate's vehicle before he reached his destination because the police began to pursue him. The next day, Flores met with Alderete and Vasquez and learned everything about Tate's murder. He stated Alderete had altered his appearance after the murder by shaving his hair. Flores also stated Alderete turned himself into authorities sometime thereafter.

Flores testified he gave the authorities two written statements after Alderete's arrest. Flores's statements indicated that he and Alderete had previously discussed the prospect of stealing Tate's car and selling it. His statements also discuss some of the events that occurred on the day Tate was murdered. Based on what Alderete had told him, Flores relayed that Alderete and Vasquez went to Tate's home on the day of the murder. When Tate answered the door, Alderete grabbed Tate, slammed her onto the ground, put his hand over her mouth, and then snapped her neck three times.[3] Afterwards, the men placed Tate's body in the trunk of her car. Flores noted that, in addition to stealing Tate's vehicle, Vasquez stole a VCR from Tate's residence.

Flores stated Alderete had indicated to him that Hernandez was one of his two accomplices. According to Flores, Hernandez was the person who recommended disposing of Tate's body. Flores further stated that Alderete and his two accomplices went for a drive after Hernandez burned Tate's body with gasoline in a cemetery.

San Antonio Police Officer Robert Moffitt testified that he interviewed Hernandez several days after Tate's body was discovered. According to Officer Moffitt, Hernandez provided authorities with a written statement concerning the events surrounding Tate's murder. Officer Moffitt then read Hernandez's written statement to the jury, which provided, in relevant part, as follows:

> This all started on Friday, December 7th, in the morning. It was about 10:30 or 10:45 in the morning, and I was hanging out at my friend Angel Vasquez'[s] trailer, on Goliad Road. Me and Angel's home boy Michael Mora, he lives two houses down from me on Wallace, was there too. The other people that were there were two girls and two other guys that I don't know. They're friends of Michael Mora. We were all hanging out and watching television, and then Angel's friend Ricky showed up. When Ricky got there, he wanted to talk to Angel, and the two of them walked off into Angel's room. I got curious to what was up and I went into the room too.

> When I went to Angel's room, Ricky was talking to Angel about getting a car and that there shouldn't be anybody there. He made it sound like they were just going to steal a car. I didn't know what car they were talking about. Ricky was telling Angel that he knew of a place that they could take the car and that they could split the money from selling the car. Ricky made it sound like that would be all there was to it. That's when Ricky told me that I could be a lookout for them and that we would split

---

2. When Flores got into the vehicle, he stated he noticed the interior was covered with WD-40 spray. Detective Deborah Whitlet of the San Antonio Police Department testified WD-40 destroys fingerprints when sprayed onto a surface.

3. Flores's statements indicate Tate may still have been moving after Alderete had slammed her down and snapped her neck.

the money from the car three ways. He told us to take some socks and put them on our hands to make sure that we didn't leave any fingerprints at the lady's house. That's when Ricky gave me and Angel a pair of socks to put on our hands. We didn't put them on then. He asked if I was willing to act as a lookout, and he told me to make sure nobody saw what was going on. I told him 'Whatever dude.' And he asked me 'Well, are you down?' And I told him again 'Whatever.' That's when we left Angel's house and started walking, following Ricky. The other people that were at Angel's house didn't know what was going on and they all stayed behind at Angel's house.

We followed Ricky to a trailer that was in the same trailer park that he lives in. On the way to the trailer, Ricky was telling us 'if she's there, I'll hold her down and cover her face, to make sure she doesn't see anybody, while you guys get the keys.' He made it sound like nobody was going to get hurt. I didn't know it was an old lady's trailer, he just said, 'she.'

When we got to the trailer, Ricky knocked on the door. He had the socks on his hands then. Angel and I had our socks on our hands too, then. I was standing by the lady's car when the lady answered the door. Ricky was standing beside the door and Angel was standing next to him. When the lady answered the door, she opened the wooden door first, and then she pushed open the screen door. When she did that, Ricky grabbed the door open and pushed the lady inside. Angel went in right after him, and Angel was telling me 'Come in, come in.' I could hear the lady screaming, and I went inside and I saw Ricky was holding the lady down on the floor. She was face up, and he had his hand over her mouth. She looked like an

older lady, and I don't remember what she was wearing.

Ricky told me to go back outside and keep a lookout. I went back outside and kept a lookout for any cars or people coming by. I was only out there for about five minutes or so. While I was outside, the screen door was closed, but the front door was open. I couldn't hear the woman screaming anymore. After about five minutes, Angel came outside and opened the trunk to the lady's car. I think it was a silver Lincoln Continental, with four doors. Angel opened the trunk and put a VCR in the trunk. Then Angel went back inside really quick and a few seconds later, he came back outside with Ricky. I didn't see them carrying anything, but I only glanced back to see them coming out. I kept a lookout and then I heard them slamming the trunk shut. Ricky told me to get into the lady's car, and I got into the front, passenger's side seat. Ricky drove and Angel rode in the back seat.

Ricky stopped at Angel's house and let Angel out. He told Angel to meet us up at the K–Mart just down the street with Angel's car. They didn't say what had happened to the old woman at this point. After dropping Angel off, Ricky drove us to the K–Mart and we waited for Angel. While we were waiting for Angel at the K–Mart, I asked him what happened to the lady, but he was kind of dazed and didn't say anything.

Then Angel, Michael Mora, and two girls drove up in Angel's car. Angel parked right up next to the old lady's car so that him and Ricky could talk from the driver's seats of their cars. Ricky was telling Angel to meet up at the Ingram Park Mall. I don't know why they wanted to meet up there, but that's what they said. On the way to the mall,

Ricky started racing with some other car on the highway and we lost Angel. Me and Ricky never did go to the mall, and Ricky told me, 'Looks like we're going to have to do this ourselves.' That's when Ricky told me about the lady in the back. He told me 'She's dead and we're going to have to get rid of her.' I asked him what happened to her, and he told me 'She saw my face, I had to take her.' I was surprised and shocked because before he told me that, I thought she was still at her house. I didn't know what to do and was just in shock about what he had told me.

That's when we started driving south. I don't know what streets or highways we were on, but I know I kept seeing signs saying 'Corpus Christi.' Ricky stopped at a gas station and told me that he wanted me to buy a gas can and some gas. He didn't say what it was for, but I had a feeling that I knew. I felt that he [was] going to burn the stuff and her. Ricky gave me seven dollars, and I went in and bought a plastic gas can and some gas. I think it came up to about six dollars for everything together. Ricky stayed in the car and kept the car parked on the side of the gas station. After I got the gas, I put the can in the back seat, and I got back in the passenger's seat. Ricky then drove us south again, and he got off on some dirt road, and then stopped by a cemetery. He parked off on the dirt road, and he asked me to help him get the body out of the trunk. I told him all right. And when he opened the trunk, he had a stick in his hands and he was poking her on the forehead to see if she was dead. She didn't move and I couldn't tell if she was alive or not. She did bleed a little bit from where he poked her on the head with the stick. Then Ricky grabbed her by the legs and told me to get her by the shoulders. I touched her

shoulders and then stopped. I couldn't touch her because I had never even seen a dead body before. I told him that I couldn't do it.

From there, Ricky dragged the woman out of the trunk by her legs. Her head hit the car and the ground and she hit the ground really hard and she didn't make any sounds. I really thought she was dead then. I grabbed the purse and some other stuff from the trunk, and then he told me to get the stuff out of the front of the car to. It was just the lady's personal stuff, like a little Garfield or stuffed animal and some cassette tapes and stuff like that. I really don't remember exactly what all I took out of the car.

I put the stuff on the ground by some trees where Ricky told me to. Then he poured some gas on the stuff and then he dragged the lady on top of the stuff and poured some gas on top of her too. That's when I knew what he was going to do for sure, and I started walking back towards the car. As I was walking towards the car, Ricky lit it up, and I could hear the lady screaming. Ricky was calling me back and he was freaking out, and he said 'She's still alive. She's still alive.' He told me, 'Get a stick and hit her, man.' Ricky got a stick and I got a stick and we were hitting her. I was hitting her because I didn't want her to suffer by burning up like that. Ricky was hitting her in the head and I was hitting her on the shoulder, then I stopped looking and I was just swinging at her. Then she stopped screaming, and Ricky told me to throw the sticks on her and that hopefully they would just burn. I threw the stick on her and then ran to the car. She wasn't moving or making any noises at that time.

After I got back to the car, Ricky drove us back to San Antonio. When we got

back to San Antonio, we stopped by Angel's house, but he wasn't there. I knocked but there wasn't any answer. Then we left and went riding and was hoping to run into Angel somewhere. Then we saw Angel over by Kennedy High School. Ricky told Angel to follow us so that we could get rid of the car. Then Angel followed us to some apartments over on the northwest side. When we got there, Ricky got some WD–40 and started spraying the inside and outside of the car. He said that would keep the police from getting our fingerprints. While we were there at the apartment complex, Ricky told me to take the rear license plate holder off of her car because it had the lady's name on it. It said something and then 'T.' I took it off, and Ricky took the holder from me. I screwed the license plate back on, and I don't know what Ricky did with the plate holder. I'm pretty sure he threw it away, but I don't know where.

After that, we rode with Angel in his car and we took Ricky back to Angel's trailer park, but towards the back of the park. After that, Angel dropped me off at my house. On the way back to my house, I told Angel what had happened. I haven't told anyone else about what happened. You asked me if the Angel that I talked to today, in your office, is the same Angel that I am talking to you about in this statement and I said 'Yes.' I have known Angel for about a year or a year-and-a-half. I had only met Ricky that day, and I haven't seen him since we dropped him off. Ricky is a friend of Angel's, and I don't really know him.

\* \* \*

I don't know if this would help, but Ricky told me that he had gotten blood on his pants, and that he would have to get rid of them by burning them, they were dark blue carpenters Tommy's.

Dr. James Fieg, a staff pathologist and regional armed forces medical examiner, testified more than 90 percent of Tate's body was charred when he reviewed her body. Visual identification of the body was not possible. Dr. Fieg stated he performed an external examination of Tate's body and discovered three gaping, ragged lacerations on Tate's head. Dr. Fieg stated he also performed an internal examination of Tate's body, which revealed linear skull fractures and brain hemorrhaging underneath Tate's skull lacerations. The internal examination further revealed Tate had a fracture through the mandible of her jaw. According to Dr. Fieg, he believed Tate's injuries were caused by blunt force trauma to the head. He explained that Tate's injuries are "consistent with someone slamming their head against a surface or taking an object, such as [a large stick], and swinging it with force against that aspect of the head." Dr. Fieg testified that the blunt force trauma injuries Tate sustained caused her death. Dr. Fieg stated such injuries would have been fatal to anyone receiving them, not just Tate. He further recognized death onsets from these types of injuries at different rates depending on the individual.

Dr. Fieg also testified about whether there was any correlation between the fire and Tate's death. Dr. Fieg stated that although Tate's autopsy did not reveal any soot in her airways, it did reveal her carbon monoxide level was slightly elevated. He stated Tate's carbon monoxide level was 4 percent, slightly above the normal range of 1 to 3 percent.[4] Dr. Fieg ex-

---

4. Dr. Fieg also stated that if an individual is a smoker, the normal carbon monoxide level can be as high as 10 percent. The record,

plained that because Tate's carbon monoxide level was only 1 percent above the normal range, he "really could not attribute much importance to that." Dr. Fieg nevertheless concluded, based on his review of Tate's airways and carbon monoxide level, that he could not make a conclusive determination as to whether or not Tate was alive at the time she was burned. Dr. Fieg further stated that gases are released from a corpse when it is burned. He noted that these escaping gases may produce high-pitched sounds. Lastly, Dr. Fieg stated that when a corpse is burned movement can occur due to contracting muscle fibers.[5]

Vincent López, Hernandez's neighbor, testified he was approached by Hernandez, Vasquez, and another individual in December of 2001. López stated the men tried to sell him a Lincoln Town Car for $2,500. He stated he declined the mens' offer when he learned that the men did not have title to the car.

██ Hernandez argues there is insufficient evidence to convict him either as a principal actor or as a party to the offense. Assuming the correctness of Hernandez's premise that the evidence is insufficient to support a finding that he committed capital murder as a principal actor, we cannot agree with his characterization of the evidence or his conclusion that there is insufficient evidence to convict him as a party to the offense.

The evidence shows that Hernandez, Vasquez, and Alderete discussed stealing Tate's new car on the morning of the murder, including each participant's role and what they planned to do if Tate was home when they went to steal her car. Hernandez assented to the plan, which called for him to act as a lookout while Alderete and Vasquez went inside Tate's residence and secured Tate's car keys. Hernandez was aware from his discussions with his cohorts that physical force would be used to subdue Tate if she was there to confront the men. Hernandez nevertheless made no attempt to dissuade Alderete or Vasquez from exerting force against Tate. Hernandez also knew that the men were going to commit their daytime raid on Tate's residence without taking any precautions to conceal their identities from Tate.

Hernandez was at Tate's residence with Vasquez and Alderete when Alderete grabbed Tate and forced his way into her residence. Hernandez stood silent when he saw Alderete subdue Tate, who was a diminutive elderly woman, by way of force. Hernandez ignored Tate's screams and assumed his position as lookout, while Alderete dealt with Tate and Vasquez helped secure Tate's car keys and a VCR.

After the fateful events at Tate's residence, Hernandez continued to assist his cohorts by helping to dispose of Tate's body. The State presented evidence that Hernandez was the one who purchased the gasoline used to set Tate's body on fire. The State also presented evidence that, after finding a suitable location to burn Tate's body, Hernandez beat Tate's body with a stick when he thought he heard screams and observed Tate's body move after being set on fire. Finally, there is evidence Hernandez continued to assist his cohorts after the men disposed of Tate's body. The jury heard that Hernandez helped Alderete and Vasquez attempt to conceal their crimes by removing her license plate holder before the men tried to

---

however, does not indicate whether Tate was a smoker.

5. The doctor described this as a "thermal artifact," a contortion of the body in which the arms raise in a "pugilistic stance."

sell the car to one of Hernandez's neighbors. Viewing the evidence in the light most favorable to the verdict, we conclude the evidence is sufficient to establish Hernandez's guilt as a party under section 7.02(a)(2) of the Penal Code as well as section 7.02(b) of the Penal Code.

■ Hernandez argues there is insufficient evidence to convict him of capital murder because the evidence shows that the burglary, robbery, and kidnaping of Tate "are unrelated to [Tate's] death." Hernandez claims that at the time he helped Alderete beat Tate in the cemetery:

all other felonies had long been completed. The robbery and burglary occurred at the victim's home. The burglary was completed long before the trip to the cemetery. Until Tate was set on fire, neither Alderete nor Appellant believed she was alive. Thus her death at the cemetery was not caused during the commission of any felony ... Moreover, Appellant was not in "immediate flight from" the robbery or burglary as that term of art is meant [when the murder occurred.]

We are not persuaded by Hernandez's argument.

Although Hernandez claims Tate was not murdered until he and Alderete beat the victim with sticks in Leal Cemetery, the jury heard evidence from which it could infer that Tate died sometime before reaching the cemetery from the injuries she received from Alderete as he physically subdued her after the men forced their way into her home. The jury heard Flores testify that Alderete had slammed Tate to the ground and snapped her neck three times upon entering Tate's home. The jury also heard Dr. Fieg testify that he discovered skull fractures and brain hemorrhaging beneath three skull lacerations located on Tate's head. Dr. Fieg noted that Tate's injuries were "consistent with

someone slamming their head against a surface" and that he believed these blunt force trauma injuries were the cause of Tate's death. The jury further heard evidence suggesting Hernandez did not actually hear screaming or see Tate's body move after she was set on fire in the cemetery. Dr. Fieg expressly testified that gases escaping from a burning corpse may produce high-pitched sounds and that a burning corpse can produce movement due to contracting muscle fibers. The jury was entitled to assess the credibility of the evidence presented, *see Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App.1991), and was free to conclude that the injuries Tate sustained from Alderete at her residence were fatal and caused her to die sometime before Hernandez and Alderete beat her with sticks in the cemetery.

Hernandez further argues that the record contains no evidence to support a rational inference that he should have anticipated that Tate might be murdered during the course of the conspiracy to commit robbery or burglary. The record, however, does not support Hernandez's contention. The record shows that Hernandez and his companions initiated their plan during the daylight hours and took no precautions to conceal their identities from Tate, who was Alderete's and Vasquez's neighbor and the only witness to the crimes. By his own admission, Hernandez was aware that he and his cohorts would confront Tate, whom he learned was a diminutive elderly woman, if she was home at the time the men carried out their plan. The record further reveals that Hernandez knew one of the men intended to use force to physically subdue the elderly victim so that the men could carry out their plan. The jury was entitled to conclude from this evidence that Hernandez should have reasonably anticipated Tate's death as a re-

sult of carrying out the conspiracy to commit robbery or burglary.

■ We understand Hernandez's frustration that the State's approach to the case on appeal differs from the approach taken by the prosecutor at trial. We further understand Hernandez's frustration with the State's refusal to commit to a specific theory of the offense on appeal with regard to when and where the murder occurred; however, the Texas Court of Criminal Appeals has "long held that when the trial court submits a jury charge setting out alternate means of committing an offense (or alternate ways to prove a specific element), the evidence is sufficient to support a general verdict of guilty of the statutory offense if the evidence is sufficient to prove any one of those alleged means." *Bagheri v. State,* 119 S.W.3d 755, 762 n. 5 (Tex.Crim.App.2003). Moreover, the standards governing our review of the legal sufficiency of the evidence on appeal are very specific. *See Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App.1997). "[S]ufficiency of the evidence [is] measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* Because the evidence is legally sufficient under our applicable standards of review, Hernandez's first, second, third, fourth, fifth, sixth, and twelfth issues are overruled.[6]

## VENUE

■ In his eighth issue, Hernandez contends the evidence is legally insufficient to prove venue in Bexar County, Texas. Venue is presumed to have been proven at trial unless venue is made an issue at trial or the record affirmatively shows otherwise. TEX.R.APP. P. 44.2(c)(1). Venue in criminal cases need only be proven by a preponderance of the evidence. *Black v. State,* 645 S.W.2d 789, 790 (Tex.Crim.App. 1983). Proof of venue may be established through direct or circumstantial evidence. *Id.* "The trier of fact may make reasonable inferences from the evidence to decide the issue of venue." *Bordman v. State,* 56 S.W.3d 63, 70 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd).

Hernandez does not point us to a place in the record where he disputed venue nor did our review of the record reflect any such objection. Because Hernandez failed to dispute venue before the trial court and the record does not affirmatively refute proper venue, we must presume that venue was proved in the trial court. *See* TEX.R.APP. P. 44.2(c)(1). Accordingly, Hernandez's eighth issue is overruled.

## CHARGE ERROR

In issues seven, nine, and ten, Hernandez asserts the trial court failed to properly instruct the jury. We disagree.

### *Mistake of Fact*

■ Hernandez's seventh issue asserts that the trial court should have instructed the jury on the defense of mistake of fact. The trial court has a duty to instruct the jury on the law applicable to the case. *Posey v. State,* 966 S.W.2d 57, 62 (Tex.Crim.App.1998). The trial court, however, has no duty to *sua sponte* instruct the jury on unrequested defensive issues. *Id.* This is true even though the

---

6. Because the evidence is sufficient to support a conviction for capital murder, we need not address Hernandez's assertion that there is insufficient evidence to establish the lesser included offenses of kidnaping, aggravated kidnaping, and aggravated robbery.

defense may have been raised by the evidence at trial. *Id.* To preserve error on a defensive issue, the defendant must object or make a specific request for the instruction. *Id.*

■ Here, Hernandez did not object to the court's charge or request that the defense of mistake of fact be included in the charge. Hernandez therefore failed to preserve this issue for our review. Hernandez's seventh issue is overruled.

### *Law of Parties*

■ Hernandez's ninth issue contends the trial court erred in instructing the jury on the law of parties when the indictment did not allege a conspiracy. The trial court's charge authorized the jury to convict Hernandez under the following three theories of capital murder: (1) as a principal; (2) as a party under section 7.02(a) of the Penal Code; or (3) as a conspirator under the law of parties pursuant to section 7.02(b) of the Penal Code. *See* TEX. PENAL CODE ANN. § 7.02(a), (b). The court of criminal appeals has repeatedly held that the law of parties may be applied to a case even though no such allegation is included within the indictment. *See Marable v. State*, 85 S.W.3d 287, 287 (Tex.Crim. App.2002); *Montoya v. State*, 810 S.W.2d 160, 165 (Tex.Crim.App.1989). "This rule applies not only to the law of parties found in Section 7.02(a) [of the Penal Code] but also the law of parties found in Section 7.02(b)." *Montoya*, 810 S.W.2d at 165. Hernandez's ninth issue is overruled.

Hernandez's tenth issue claims the trial court erred in instructing the jury on the law of parties pursuant to section 7.02(b) of the Penal Code because section 7.02(b) is inapplicable in capital cases. The court of criminal appeals has recognized, however, that the law of parties set forth in section 7.02(b) does apply in capital cases.

*See id.* Hernandez's tenth issue is overruled.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In his eleventh issue, Hernandez alleges he was denied effective assistance of counsel. The United States and Texas Constitutions guarantee the right to reasonably effective counsel. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. To reverse a criminal defendant's conviction on ineffective assistance of counsel grounds, the defendant must demonstrate by a preponderance of the evidence that: (1) counsel's performance was so deficient as to fall below an objective standard of reasonableness; and (2) there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App.1999); *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex.Crim.App.1986). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Thompson*, 9 S.W.3d at 812.

■ On review, we give great deference to counsel's representation at trial. *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim.App.2000). We look to the totality of the representation at trial, not isolated acts or omissions of counsel in hindsight. *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Crim.App.1986). Any allegations of ineffectiveness must be firmly founded in the record, and the defendant must overcome the strong presumption that counsel rendered adequate assistance and that counsel's actions were the result of sound trial strategy. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App.1994). The defendant's burden is even more difficult when, as in this case, the defendant does not file a motion for new trial assert-

ing ineffective assistance of counsel. *Thompson,* 9 S.W.3d at 813–14; *Jackson v. State,* 973 S.W.2d 954, 957 (Tex.Crim.App. 1998). In most cases, a silent record which provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Mallett v. State,* 65 S.W.3d 59, 63 (Tex.Crim. App.2001); *Thompson,* 9 S.W.3d at 813–14.

### Defense instruction on mistake of fact

 Hernandez's primary basis for his claim of ineffective assistance is counsel's failure to request an instruction raised by the evidence. A defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence regardless of whether the evidence raising the issue is strong, weak, unimpeached, contradicted, or unbelievable. *Muniz v. State,* 851 S.W.2d 238, 254 (Tex.Crim.App. 1993). Hernandez claims that because the evidence allowed for an instruction on mistake of fact, defense counsel's failure to request an instruction on this issue amounted to ineffective assistance of counsel. *See* TEX. PEN.CODE ANN. § 8.02(a) (Vernon 2003) ("It is a defense to the prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense.").

Even if we were to conclude the evidence allowed for an instruction on mistake of fact, we cannot declare counsel ineffective based upon her failure to request such instruction. At trial, defense counsel's strategy, in light of the strong evidence of Hernandez's guilt, was apparently to seek a conviction of a lesser offense, particularly burglary of a habitation.[7] Counsel may have determined that it would be a more effective approach to focus the jury on a relatively narrow defense, rather than to use a "shotgun" approach by arguing every defense available, including those that were not well supported by the evidence. Under the circumstances, a defensive strategy of pursuing a conviction on a lesser offense was not objectively unreasonable. *See Hathorn v. State,* 848 S.W.2d 101, 118 (Tex. Crim.App.1992) (holding defense counsel's strategy of trying to get the jury to convict the defendant of a lesser offense can be explained as a sound trial strategy); *Dannhaus v. State,* 928 S.W.2d 81, 87 (Tex.App.-Houston [14th Dist.] 1996, pet. ref'd) (same).

In any event, even if Hernandez's attorney had a different reason for not seeking an instruction on mistake of fact, it is not reflected in the record. Although Hernandez filed a motion for new trial, he did not raise his ineffective assistance of counsel claim in that motion and failed to develop a record that might have supported his claim. Hernandez simply cannot overcome the strong presumption that counsel rendered adequate assistance of counsel in this instance.

### Other contentions

 Hernandez's remaining bases for his claim of ineffective assistance of counsel concern defense counsel's: (1) failure to object to the State's alleged failure to prove venue; and (2) failure to request a definition of "person" in the jury charge. As previously noted, a motion for new trial was filed below, but it did not allege ineffective assistance of counsel. We therefore do not have any explanation from defense counsel in the record as to why counsel acted or failed to act as she did. Absent a record to indicate defense counsel's strategy and tactics, we may not spec-

---

**7.** Defense counsel argued to the jury in closing argument that, "the evidence shows that, if [Hernandez] is guilty, it is probably ... burglary of a habitation...."

271

ulate as to why counsel failed to contest venue or failed to request a definition of person in the charge. Without more, we must presume that counsel acted pursuant to a reasonable trial strategy. Hernandez's contention of ineffective assistance must be overruled.

CONCLUSION

The trial court's judgment is affirmed.