Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


★ ★ ★ ★ ★ ★ ★



## MEMORANDUM OPINION

No. 04-11-00487-CR

Gregory **LOPEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 38th Judicial District Court, Medina County, Texas
Trial Court No. 09-08-10155-CR
Honorable Mickey R. Pennington, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:       Catherine Stone, Chief Justice
               Phylis J. Speedlin, Justice
               Steven C. Hilbig, Justice

Delivered and Filed:  August 29, 2012

AFFIRMED

Gregory Lopez appeals his conviction for capital murder.  We affirm the judgment of the

trial court.

### BACKGROUND

In 2009, Lopez was indicted for capital murder for the killings of Raymond Alexander

Morales ("Alex") and Andrea Dawn Traux ("Andrea"), who were reported missing in the spring

of 1994.  Texas Ranger Ron Trampas Gooding testified that he began investigating the "cold

case" in 2008 after he received a tip that Henry Teneyuca, an inmate at a federal prison in Fort Worth, had information pertaining to the murders of Alex and Andrea. Teneyuca was in prison after being arrested on federal drug charges involving methamphetamine and hoped to benefit from cooperating with the authorities. Specifically, he wanted time off his sentence and a prison transfer because he thought the Mexican Mafia was after him.[1] Teneyuca told Gooding that Alex was a drug dealer involved in a drug ring that transported narcotics from Texas to Indiana. Although Alex was married to his second wife, Kim, he was dating Andrea, an exotic dancer. Several people were involved with Alex's drug business, including Manuel Rodriguez, Daryl Butts, Teresa "Terri" Velarde, Roger Gillespie, and appellant Gregory Lopez. Teneyuca had worked at Humana Hospital with Butts and Gillespie, both of whom stole medical equipment from the hospital and sold it for a profit. Teneyuca also sold methamphetamine and marijuana to Butts and Gillespie.

Teneyuca met Rodriguez through Butts. Rodriguez allowed Alex to store drugs on his 30-acre property near Natalia. Alex's drug business was very profitable until he began to live beyond his means and was unable to pay off his debts. At the time of his death, Alex allegedly owed $160,000 to Rodriguez and Lopez.

Teneyuca claimed that Rodriguez told him about the murders of Alex and Andrea which occurred on Rodriguez's property in April 1994. Rodriguez told Teneyuca that Lopez shot and killed Alex, and that he (Rodriguez) shot Andrea in the back and then walked up to her and shot her one more time. Teneyuca said that several months later, on Halloween, Butts asked him to come to Rodriguez's place. Rodriguez had dug the bodies up and together Rodriguez, Butts and

---

[1] Teneyuca was transferred from Fort Worth to El Paso and released in early 2008; however, a month later he was arrested for possession of methamphetamine and was incarcerated in state prison when he testified at Lopez's trial.

Teneyuca burned the bodies. Teneyuca claimed that Rodriguez saved some souvenirs from the bodies: a belt buckle, a diamond from a ring, and a firing pin from one of the murder weapons.

To corroborate Teneyuca's story, Gooding began to interview others, including Daryl Butts and his wife Terri Velarde, as well as Manuel Rodriguez. Butts bought marijuana from Teneyuca and knew that he along with Rodriguez and Lopez were involved in a drug distribution operation. Butts was very good friends with Lopez. Butts learned that Alex owed money to Lopez and Rodriguez, and the group often discussed what could be done to prevent Alex from stealing more money from them. Butts suggested building a claymore mine or a bomb. Another member of the group, Roger Gillespie, suggested using a paralytic drug that he could get at the hospital where he worked. Butts knew the drug was fatal because he used it to kill a Great Dane who had attacked his mother's Pit Bull. Shortly after this discussion, Rodriguez asked Butts to buy some lime and bring it to his property. Butts bought a couple of big bags of lime and took them to Rodriguez's property, knowing the lime would be used to get rid of Alex's and Andrea's bodies. About six weeks later, Butts received a phone call from Rodriguez, who said that he had shot two bobcats. Butts understood this to mean that Alex and Andrea had been killed. Rodriguez later told Butts that Lopez had shot Alex and that he had shot Andrea. About six months later, on Halloween, Rodriguez asked Butts to come to his place. Butts and Teneyuca went together. When they arrived they saw that Rodriguez was digging up Alex's and Andrea's bodies with a backhoe digger. Rodriguez put the bodies on a big brush pile that he doused with gasoline and lit on fire. The next morning, Butts found a turquoise belt buckle near the burn pile and gave it to Rodriguez.

Butts was charged with conspiracy to commit capital murder. He agreed to plead guilty to conspiracy to commit the lesser offense of murder in exchange for providing the State with

information and testifying on the State's behalf. The State agreed to a twenty-year cap in exchange for Butts' truthful testimony; his sentencing was delayed until after Lopez's trial.

Terri Velarde was Butts' wife and Rodriguez's ex-wife. Velarde and Butts occasionally transported marijuana for Alex. Velarde was present when the group discussed killing Alex and Andrea, but she was not sure if they were serious because they were all using drugs at the time. On April 24, 1994, Velarde told Rodriguez that she was going to visit her mother, who lived near Rodriguez. Velarde recalled Rodriguez asking her to call him if she saw Alex and Andrea on the road to his home. Later that day, Velarde did see Alex and Andrea driving into LaCoste; Velarde turned around and stopped at a store to use the phone and call Rodriguez. Several months later, Rodriguez told Velarde that he and Lopez "did away with" Alex and Andrea. Rodriguez told her that Lopez shot Alex and that he shot Andrea in the back of the head. Rodriguez said Andrea fell to the ground and made a moaning sound and "that was it." Velarde denied knowing that the murders were to take place on April 24, 1994, and did not think anything of Rodriguez asking her to alert him if she saw Alex and Andrea on the road that day. The State notified Velarde by letter that it possessed "information and testimony establishing probable cause to believe" that she committed the offense of conspiracy to commit capital murder. However, the State offered not to prosecute Velarde if she would provide information and testify for the State, and she agreed to do so.

When Gooding interviewed Rodriguez, he initially denied any involvement in the killings. After learning that Gooding had already talked to several of the others with knowledge of the murders, Rodriguez became more forthcoming as to his role in the murders. At trial, Rodriguez testified that Alex used to store marijuana in an 18-wheeler trailer on Rodriguez's property, and that others, such as Butts and Velarde, would help to transport the drugs.

Rodriguez had met Lopez through Butts, who was married to Rodriguez's ex-wife, Terri Velarde. When Alex failed to pay the money he owed to Lopez and Rodriguez, Rodriguez asked Lopez about it. Lopez replied that he would "take care of it." The group began to talk about ways to kill Alex, such as placing a bomb in Andrea's house, where Alex often stayed, or cutting Alex's jugular vein and letting him bleed out.

Rodriguez testified that on April 24, 1994, he arrived at his property in the late afternoon. Lopez, Alex, and Andrea were already there. The men introduced Andrea to Rodriguez and they all snorted methamphetamine together, except for Alex, who was ill from diabetes and cirrhosis of the liver. Rodriguez left his travel trailer to go check the mail, and when he returned five minutes later, Lopez and Alex were gone. Andrea informed Rodriguez that they had gone down to the 18-wheelers to look at some pot. Rodriguez knew there was no marijuana there, and jumped on his three-wheeler and headed toward the 18-wheelers. When he arrived, Alex looked very ill, and asked Rodriguez to go back and get his medicine and Andrea. Rodriguez made the 30-second trip back to his travel trailer. When he entered the trailer, Andrea pointed a gun at him, asking if he had heard a shot. Rodriguez said no and explained that Alex needed his medicine. Andrea followed Rodriguez back to the 18-wheelers, pointing a gun at his back. When Rodriguez passed a truck, he placed his gun down on the hood in an attempt to calm Andrea. She then continued on ahead of him, and came upon Alex's dead body lying near the 18-wheelers. Andrea turned back toward Rodriguez with her gun raised, and Rodriguez shot her with a .22 caliber pistol he had in his back pocket. Rodriguez stated Andrea fell forward and moaned, and that Lopez shot her a second time in the head.

Lopez and Rodriguez then buried the bodies on Rodriguez's property, using a backhoe to dig the hole. They poured lime on the bodies to aid in decomposition. Rodriguez and Lopez

then drove Andrea's car to San Antonio and abandoned it in a parking lot with the keys in the ignition. Rodriguez further testified that about six months later, on Halloween, he, Butts, and Teneyuca unearthed the bodies and burned them.

Almost fifteen years later, in June 2009, law enforcement authorities arrived at Rodriguez's property with a search warrant. An exhaustive six-day search of the property did not uncover any evidence of human remains or a grave site. A belt buckle that could not be conclusively tied to either Andrea or Alex was found in Rodriguez's travel trailer, as was a diamond that Rodriguez denied belonged to Andrea. Rodriguez made a statement in which he admitted shooting Andrea. Rodriguez was charged with capital murder, but agreed to testify for the State against Lopez and the charge was reduced to murder; in exchange for his truthful testimony, the State agreed to a sentence of twenty years.

When the authorities finally interviewed Lopez, he initially denied any involvement. However, after being confronted with the video recording of Rodriguez's statement, Lopez admitted shooting Alex, although he claimed it was in self-defense. Lopez did not testify at his trial, but an audio recording of his statement was admitted. The jury found Lopez guilty of capital murder as alleged in the amended indictment, and the trial court sentenced him to life imprisonment. Lopez timely appealed.

## DISCUSSION

In four issues on appeal, Lopez asserts that: (1) the trial court erred in refusing to instruct the jury that Daryl Butts and Terri Velarde were accomplice witnesses as a matter of law; (2) the evidence is insufficient to support his conviction for capital murder; (3) the trial court erred in refusing to admit impeachment evidence; and (4) the trial court erred in allowing the State to amend the indictment on the day of trial. We address each issue in turn.

**ACCOMPLICE WITNESS INSTRUCTION AND SUFFICIENCY OF THE EVIDENCE**

Lopez first asserts the trial court erred by not granting his request for a jury instruction that Butts and Velarde were accomplices as a matter of law because they were charged with conspiracy to commit capital murder and their charges were reduced in exchange for their information and testimony at Lopez's trial,[2] and because they aided and encouraged the others in commission of the murders. In Lopez's second issue, he complains the evidence is insufficient to support his conviction for capital murder because there is no evidence, other than accomplice testimony, tying him to Andrea's murder. Because the issues regarding omission of the accomplice witness instruction and sufficiency of the evidence are related, we address them together.

*Accomplice Witness — Applicable Law*

The Legislature has determined that the factfinder should exercise caution when considering the testimony of an accomplice because "accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person." *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (quoting *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)). Thus, Article 38.14 of the Texas Code of Criminal Procedure provides that a defendant cannot be convicted upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; the corroboration is not sufficient if it merely shows the commission of the offense. TEX. CODE CRIM. PROC. art. 38.14 (West 2005). An accomplice's testimony cannot be corroborated by prior statements by the accomplice witness made to a third person. *Smith*, 332 S.W.3d at 439.

---

[2] At trial, Lopez requested a jury instruction that Rodriguez, Butts, and Velarde were accomplices as a matter of law. The trial court gave the instruction as to Rodriguez, but denied it as to Butts and Velarde and Lopez objected.

An accomplice is one who participates in the offense, before, during, or after its commission, to the extent that he can be charged with the offense or with a lesser-included offense. *Blake*, 971 S.W.2d at 454-55. A prosecution witness who is indicted for the same offense with which the defendant is charged is an accomplice as a matter of law and the trial court is under a duty to instruct the jury accordingly. *Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991); *Blake*, 971 S.W.2d at 455. If the State dismisses the indictment before the witness testifies, the witness is no longer deemed an accomplice as a matter of law. *Smith*, 332 S.W.3d at 439. A witness continues to be regarded as an accomplice, however, if the witness agrees to testify against the accused in exchange for the dismissal of the charge. *Id.*

Assuming that Butts and Velarde were accomplices as a matter of law, we conclude the failure to give the accomplice witness instruction as to them was harmless.[3] To determine the harm resulting from the omission of an instruction, we must consider the effect an accomplice-witness instruction has on the trial. *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002). Article 38.14 provides that a conviction cannot be based on an accomplice's testimony unless that testimony is corroborated by other evidence that tends to connect the defendant to the offense. *Id.* at 631-32. The instruction does not state that the jury should be skeptical of accomplice-witness testimony, nor does it instruct the jury to give less weight to accomplice testimony than to other evidence. *Id.* at 632. Rather, the instruction simply informs the jury that it cannot consider the accomplice-witness testimony unless there also exists some non-accomplice evidence connecting the defendant to the offense. *Id.* Once it is determined that such non-accomplice evidence exists, the instruction's purpose is fulfilled, and the instruction

---

[3] Under *Almanza*, the appropriate harm analysis depends upon whether the defendant preserved error by bringing the omission to the trial court's attention. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). When the error is properly preserved, as it was in this case, reversal is required if "some harm" is shown. *Id.* Thus, we examine the record to see if "some harm" was shown.

plays no further role in the jury's decision-making. *Id.* Therefore, by fulfilling the purpose the instruction is meant to serve, the presence of non-accomplice evidence connecting the defendant to the offense can render harmless a failure to submit an accomplice-witness instruction. *Id.* In determining the strength of a particular item of non-accomplice evidence, we examine (1) its reliability or believability, and (2) the strength of its tendency to connect the defendant to the crime. *Id.*

In determining whether there is sufficient corroboration, we eliminate the accomplice witness evidence and then examine the remaining evidence of other witnesses to determine whether there is evidence of an incriminating character which tends to connect the defendant with the commission of the offense. *Burks v. State*, 876 S.W.2d 877, 887 (Tex. Crim. App. 1994); *see also Simmons v. State*, 282 S.W.3d 504, 509 (Tex. Crim. App. 2009) (in reviewing whether accomplice testimony is sufficiently corroborated, appellate court must ask whether a rational fact-finder could conclude that the non-accomplice evidence "tends to connect" appellant to the offense). It is not necessary that the evidence corroborating the accomplice witness testimony directly link the accused to the crime or be sufficient in itself to establish guilt. *Romero v. State*, 716 S.W.2d 519, 523 (Tex. Crim. App. 1986). It is sufficient if the combined cumulative weight of the incriminating evidence furnished by non-accomplice evidence tends to connect the accused with the commission of the offense. *Id*.

### *Appellant's Confession — Corroborating Evidence*

Eliminating the testimony of Rodriguez and Teneyuca,[4] as well as Butts and Velarde, we are left with non-accomplice evidence consisting of Lopez's own confession. In his statement to authorities, Lopez admitted having a gun on him and being present at the time of both shootings.

---

[4] We eliminate Teneyuca's testimony because his knowledge of the murders came directly from Rodriguez, who was an accomplice. *See Smith*, 332 S.W.3d at 439 (accomplice's testimony cannot be corroborated by prior statements made by accomplice witness to third person).

Lopez stated that he argued and scuffled with Alex down by the 18-wheelers on Rodriguez's place before he shot Alex once in the head; Lopez claimed he shot Alex in self-defense. Lopez stated that Rodriguez and Andrea came running after the gunshot, and that he saw Rodriguez shoot Andrea in the back of the head. Lopez further admitted that shortly after the shootings, he drove Andrea's car to San Antonio where he abandoned it; Lopez then rode back with Rodriguez to his property. Lopez also conceded there may have been advance talk in the group about killing Alex, or about Alex needing to be killed, but he denied that it was a "planned" killing that day.

Lopez does not complain on appeal that his statement to authorities was involuntary or otherwise inadmissible, and the statement was admitted and the audio tape was played before the jury at trial. A defendant's confession may be sufficient to corroborate the testimony of an accomplice if proof of the confession does not depend on the testimony of the accomplice. *See Ex parte Martinez*, 330 S.W.3d 891, 894 n.4 (Tex. Crim. App. 2011); *Farris v. State*, 819 S.W.2d 490, 495 (Tex. Crim. App. 1990), *overruled on other grounds by Riley v. State*, 889 S.W.2d 290, 300-01 (Tex. Crim. App. 1994); *see also Jackson v. State*, 516 S.W.2d 167, 171 (Tex. Crim. App. 1974) ("It is well established that appellant's admission or confession, under most circumstances, will be sufficient to corroborate the accomplice witness.").

Here, Lopez's confession connects him, independently of any accomplice testimony, to the commission of both murders that form the basis of the capital murder offense; thus, the confession sufficiently corroborates the accomplice witnesses' testimony such that the jury could consider the accomplice testimony pursuant to article 38.14. *See Jackson*, 516 S.W.2d at 171 (accomplice testimony in murder prosecution was adequately corroborated by appellant's judicial confession although appellant testified he acted in self-defense); *Farris*, 819 S.W.2d at

495; *see also Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007) (defendant's "admission that he participated in the crime, although he denied being a shooter, is enough to tend to connect him to the offense"). As to Alex's murder, Lopez admits he is directly responsible as the primary actor, i.e., Alex's shooter. Lopez's confession also tends to connect him to Andrea's murder in that it shows he was present at the time and witnessed her being shot, her shooting happened right after Lopez shot Alex and in the same location, and Lopez participated in removing Andrea's car from the murder scene and abandoning it in San Antonio; this evidence goes to show that Andrea's murder was part of the same criminal transaction as Alex's murder to which Lopez confessed. *See Smith*, 332 S.W.3d at 443, 445 (proof that defendant was at scene of crime at the time of its commission, when coupled with other suspicious circumstances, may tend to connect the defendant and be sufficient corroboration to support the conviction). Accordingly, any error in failing to instruct the jury that Butts and Velarde were accomplice witnesses was harmless because Lopez's confession provides sufficient independent corroboration of the accomplices' testimony and tends to connect him to both murders that form the basis of his capital murder conviction.

### *Sufficiency of the Evidence to Support Capital Murder Conviction — Law of Parties*

While Lopez concedes that he killed Alex, he argues on appeal that there is no evidence to prove that he is responsible for Andrea's murder, either as a primary actor or as a party. Specifically, Lopez argues the only evidence connecting him to Andrea's murder came from the testimony of accomplice witnesses, which the jury was required to disregard in the absence of independent corroborating evidence connecting him to Andrea's murder.

Setting aside the accomplice testimony for a moment, Lopez's confession is legally sufficient to support a jury finding that he is criminally responsible for Andrea's death as a party

to the offense. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011). The law of parties provides that a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *See* TEX. PENAL CODE ANN. § 7.02(a)(2); *Hernandez v. State*, 198 S.W.3d 257, 261 (Tex. App.—San Antonio 2006, pet. ref'd). Here, the trial court instructed the jury that it could find Lopez guilty of capital murder as a principal or as a party. The jury returned a general verdict; thus, if the evidence is sufficient to support a finding under either theory submitted to the jury, we must uphold the jury's verdict. *Hernandez*, 198 S.W.3d at 261. Under the party instruction, the jury was authorized to convict Lopez as a party to capital murder if the evidence was sufficient to show that, "acting with the intent to promote or assist the commission of the said offense murder [of Andrea] by Manuel Rodriguez," Lopez solicited, encouraged, directed, aided, or attempted to aid Rodriguez to commit Andrea's murder. Evidence is sufficient to convict under the law of parties where the accused is physically present at the commission of the offense and encourages its commission by words or other agreement. *Id.* In determining whether an accused participated as a party, the fact finder may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the accused that show an understanding and common design to commit the offense. *Id.* Further, circumstantial evidence may be used to prove party status. *Id.*

Lopez admitted that he invited Alex to Rodriguez's property on the day of the murders, and that there had been prior discussions in the group about killing Alex. Lopez stated he knew that Rodriguez was carrying a gun the day of the murders. Lopez admitted he shot Alex down by the 18-wheelers, and that he was present when Rodriguez shot Andrea; thus, he admitted both

murders took place in the same location and very close in time. In addition, Lopez's admitted conduct after the shootings goes to show that he intended to prevent the discovery of his participation in the murders, thus providing evidence of his intent to assist in the commission of Andrea's murder. Lopez admitted driving Andrea's car to San Antonio right after the murders and abandoning it in a parking lot before returning with Rodriguez to his property. *See Hernandez*, 198 S.W.3d at 261 (fact finder may examine events occurring after commission of offense in determining whether accused participated as a party). Viewing the evidence in the light most favorable to the jury's finding, the evidence was sufficient to allow a rational juror to find that Lopez was guilty as a party to Andrea's murder.

In addition, as discussed *supra*, Lopez's confession also sufficiently corroborates the accomplices' testimony about the murders; therefore, the jury was permitted under article 38.14 to consider the accomplices' testimony in determining whether Lopez was guilty of capital murder. The jury was free to consider and believe Rodriguez's testimony that Lopez told him he would "take care of it" with respect to Alex's debt, and that Lopez shot Andrea in the head after she fell to the ground, along with Velarde's testimony that Rodriguez told her he and Lopez "did away with" Alex and Andrea, and Butts' testimony that the group discussed various ways to kill Alex. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

Based on Lopez's own confession, along with the accomplice testimony, we therefore conclude that the evidence is legally sufficient to support the jury's verdict that Lopez is guilty of the offense of capital murder as charged in the amended indictment. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (holding that to determine whether the evidence is

sufficient to support a criminal conviction, the court examines "all of the evidence in the light most favorable to the verdict," asking if a jury was "rationally justified in finding guilt beyond a reasonable doubt") (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

EXCLUSION OF IMPEACHMENT EVIDENCE

Lopez next argues that the trial court erred by excluding evidence of a pending civil action to forfeit Rodriguez's real estate that he proffered to demonstrate Rodriguez's bias in favor of the State.

At trial, the defense sought to cross-examine Ranger Gooding about a pending civil forfeiture of Rodriguez's home and surrounding property. The State objected, stating that the civil forfeiture was not relevant in a criminal trial. The trial court sustained the objection, but permitted Gooding to testify as to the meaning of a forfeiture. Defense counsel then asked Gooding whether his report mentioned forfeiture of Rodriguez's property. The State again objected, and court was adjourned for the day. The next day, Gooding testified that he gave Rodriguez a receipt for the items that were seized during the search of his property. Defense counsel then asked Gooding if he had "any knowledge of anything about a forfeiture suit of the land out there?" Gooding replied no, and stated he was not involved in the forfeiture. Gooding did explain that the forfeiture involved Rodriguez's thirty acres of land.

The next day, the State called Rodriguez as a witness. A hearing was held outside the jury's presence on the forfeiture evidence. The defense introduced the original notice of forfeiture and a notice to take Rodriguez's deposition. The court ruled that the defense would be allowed to ask Rodriguez whether the civil forfeiture was part of his consideration in deciding whether to enter into his plea; "if not, it's irrelevant." The defense declined to ask any questions of Rodriguez. The State asked Rodriguez whether he entered into a plea agreement with the

State. Rodriguez answered yes, and acknowledged that, on the advice of his lawyer, he agreed to plead guilty to murder in exchange for a twenty-year sentence; in return, the State demanded that he testify truthfully. Rodriguez stated there was no other reason why he decided to plead guilty. The State passed the witness, and the defense declined to ask further questions. The trial court ultimately sustained the State's relevancy objection. Following that hearing, direct-examination of Rodriguez ensued. Rodriguez volunteered the following information without objection:

> I was served a civil lawsuit by the State of Texas for the intended forfeiture of all my property, my 30 acres that I worked to live on and you know, bought. I mean to the fifty years I've lived there. So all that's gone, you know. It's all gone. It's all gone.

Lopez now complains that he was deprived of his right to cross-examine Rodriguez about the forfeiture and to allow the jury to assess Rodriguez's credibility. The Constitutional right of confrontation is violated when appropriate cross-examination is limited. *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996); *Hurd v. State*, 725 S.W.2d 249, 252 (Tex. Crim. App. 1987). The scope of appropriate cross-examination is necessarily broad and includes the opportunity to expose a motive, bias, or interest for the witness to testify. *Lewis v. State*, 815 S.W.2d 560, 565 (Tex. Crim. App. 1991). A defendant is permitted to elicit any fact from a witness intended to demonstrate that witness's vulnerable relationship with the State. *Carroll*, 916 S.W.2d at 500; (*citing Alford v. U.S.*, 282 U.S. 687, 692 (1931)).

There are, however, several areas where cross-examination may be inappropriate and, in those situations the trial judge has the discretion to limit cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Specifically, a trial judge may limit cross-examination when a subject is exhausted, or when the cross-examination is designed to annoy, harass, or humiliate, or when the cross-examination might endanger the personal safety of the witness. *See id.* In any event, the constitutional right to cross-examine concerning the witness's potential bias or

prejudice does not include "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id*.

We conclude that any error in limiting the cross-examination of Rodriguez on the forfeiture issue was rendered harmless by Rodriguez's subsequent admission to the jury that his property had been seized by the State. *See Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (finding, in context of constitutional error, that exclusion of testimony did not contribute to conviction or punishment where same testimony was later admitted); *Baldree v. State*, 248 S.W.3d 224, 232 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (same). Further, the jury was given many reasons to doubt Rodriguez's credibility, including testimony that he used drugs, warehoused drugs for sale, and admitted to shooting Andrea. Additionally, the jury was informed several times that Rodriguez agreed to plead guilty in exchange for a twenty-year sentence, and thus aware that he may have had an interest in testifying favorably to the State. Accordingly, we resolve Lopez's third issue against him.

### AMENDED INDICTMENT

Finally, Lopez complains that the trial court erred in allowing the State to amend the indictment on the day of trial. On August 3, 2009, Lopez was indicted for the offense of capital murder. The indictment alleged, in pertinent part, as follows:

> Gregory Lopez . . . on or about the 28th day of April, A.D. 1994, did then and there intentionally or knowingly cause the death of an individual, namely, Andrea Dawn Traux, by shooting Andrea Dawn Traux, and did then and there intentionally or knowingly cause the death of another individual, namely, Raymond Alexander Morales, by shooting Raymond Alexander Morales, and both murders were committed during the same criminal transaction.

On March 4, 2011, the parties appeared before the trial court to address pre-trial motions. At that time, the State informed the trial court and defense counsel of its intention to file a motion to amend the indictment by adding the phrase "with a firearm" to that portion of the

indictment alleging that Lopez shot Andrea and Alex. Defense counsel had no objections, stating, "I think they have the perfect right under the statute to make that amendment any time before trial and we will agree to it and will not be asking for the extra ten days after they do it." The trial court informed the State that it needed to file a written motion to amend the indictment, and further stated that once the motion was filed "we will hold it in the file and the day of the jury selection if there be no objection it being filed at that time then I'll sign it and it will be amended."

Thereafter, the State filed a motion to amend the indictment. The trial court[5] granted the motion on March 18, 2011 and ordered that the indictment be amended to read as follows:

> Gregory Lopez . . . on or about the 28th day of April, 1994, did then and there intentionally or knowingly cause the death of an individual, namely Andrea Dawn Traux, by shooting Andrea Dawn Traux with a firearm, and did then and there intentionally or knowingly cause the death of another individual, namely Raymond Alexander Morales, by shooting Raymond Alexander Morales with a firearm, and both murders were committed during the same criminal transaction.

The trial court further found that the amendment did not charge Lopez with an additional or different offense, and did not prejudice Lopez's substantial rights. The order was filed on March 22, 2011.

On April 4, 2011, voir dire was conducted. The next day, defense counsel objected to the amending of the indictment, stating that the indictment may not be amended on the day of trial without consent of the defendant. The trial court overruled Lopez's objection, added "with a firearm" to the original indictment, and stated, "As I recall, and it's the ruling of the Court that the amendment was presented to the Court on the record and was agreed to be amended on the record and the Court is simply making a clerical entry here today."

---

[5] The order was signed by the Honorable Camile G. DuBose, presiding judge of the 38th Judicial District Court, Medina County, Texas.

A criminal defendant is guaranteed the right to know the allegations against him contained in an indictment returned by a grand jury and to have a copy of the indictment. TEX. CONST. art. I, § 10. An indictment vests the trial court with jurisdiction and provides the defendant with notice of the offense with which he is charged so that he may prepare, in advance of trial, an informed and effective defense. *Riney v. State*, 28 S.W.3d 561, 565 (Tex. Crim. App. 2000). Article 28.10(b) of the Code of Criminal Procedure provides that an indictment may be amended after trial begins only if the defendant does not object. TEX. CODE CRIM. PROC. ANN. art. 28.10(b) (West 2006); *see also Barrera v. State*, 321 S.W.3d 137, 143-44 (Tex. App.—San Antonio 2010, pet. ref'd).

Lopez argues that under *Ward v. State*, 829 S.W.2d 787, 793 (Tex. Crim. App. 1992), an amendment is not effective until the actual charging instrument is altered. In *Riney*, the Texas Court of Criminal Appeals considered the continuing precedential value of *Ward.* The *Riney* court overruled *Ward* and the cases relying on it to the extent they require physical interlineation of the original indictment as the only means to accomplish an amendment. *Riney*, 28 S.W.3d at 566. The court stated, "Physical interlineation of the original indictment is an acceptable but not the exclusive means of effecting an amendment to the indictment." *Id.* at 565.

This court has held that a written order granting the State's motion to amend, in which the language of the original indictment is reproduced, is an effective amendment. *Aguilera v. State*, 75 S.W.3d 60, 64 (Tex. App.—San Antonio 2002, pet. ref'd) (citing *Valenti v. State*, 49 S.W.3d 594, 598 (Tex. App.—Fort Worth 2001, no pet.)). Thus, we disagree with Lopez's assertion that the amendment was only effective once it was actually altered. Here, Lopez was present at the March 4, 2011 hearing at which the amendment issue was raised, had notice of the intended amendment, and had no objection to the amendment. Thereafter, the State filed a

motion to amend the indictment. The order granting the motion to amend reproduced the language of the original indictment as well as the amending language as requested in the State's motion. Consequently, we hold that the order was sufficient to amend the indictment and to put Lopez on notice of the amended language in the indictment. *See Riney*, 28 S.W.3d at 565-66; *Aguilera*, 75 S.W.3d at 64. Because the amendment of the indictment was effective prior to trial, the trial court did not err in proceeding to trial on the amended indictment. *See Westmoreland v. State*, 174 S.W.3d 282, 285-87 (Tex. App.—Tyler 2005, pet. ref'd) (holding that amendment to indictment was effective when (1) State filed motion to amend which contained the language of the original indictment and the requested amending language; (2) defendant was present at hearing on motion to amend, had notice of intended indictment, and did not object to amendment; and (3) order granting motion to amend included amended language). We therefore overrule Lopez's fourth issue.

## CONCLUSION

Based on the foregoing, we overrule Lopez's issues on appeal, and affirm the judgment of the trial court.

Phylis J. Speedlin, Justice

Do not publish

- 19 -