

## NUMBER 13-11-00722-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**MARCUS PEÑA,**                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                             **Appellee.**

---

### On appeal from the 377th District Court
### of Victoria County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Garza, Benavides and Perkes
### Memorandum Opinion by Justice Garza

Appellant, Marcus Peña, was convicted of aggravated robbery, a first-degree felony, *see* TEX. PENAL CODE ANN. § 29.03(a)(2), (b) (West 2011), and capital murder. *See id.* § 19.03(a)(2), (b) (West Supp. 2011). He was sentenced to life imprisonment for the aggravated robbery count and life imprisonment without parole for the capital murder count. By two issues, appellant contends the evidence was insufficient to

support his conviction.  We affirm.

## I. BACKGROUND

Appellant and co-defendant David Francisco Barron were tried together for the murder of Jason Garcia.  In 2011, we affirmed the judgment convicting Barron of capital murder, concluding that the evidence was sufficient to support a finding of guilt.  *See Barron v. State*, No. 13-10-00534-CR, 2011 Tex. App. LEXIS 7204, at *23–33 (Tex. App.—Corpus Christi Aug. 31, 2011, no pet.) (mem. op., not designated for publication). The summary of evidence that follows is based on the same trial record, and is therefore largely the same as we recited in *Barron*.  *See id.* at *2–23.

At around 2:15 a.m. on August 23, 2009, a 911 call reported that a lifeless body was lying face-down in the parking lot of Magic Industries, a business located in Victoria, Texas.  Sergeant Eline Moya of the Victoria Police Department was dispatched to the scene.  She noted that the victim had blood on his face and coming out of his ears, and he did not have a pulse.  The victim, later identified as Jason Garcia, was pronounced dead.

Leisha Wood, M.D., of the Travis County Medical Examiner's Office, conducted an autopsy.  She stated that Garcia had significant bruising, a broken nose, swelling of the brain, and numerous blunt-force injuries on all sides of his face and scalp.  Garcia's head was distended, which was consistent with his having been kicked in the head.  He also had several "defensive-type injuries" on his arms.  Dr. Wood concluded that the cause of death was "multiple blunt force head and neck injuries."  On cross-examination, Dr. Wood acknowledged that Garcia's use of drugs, including cocaine and marihuana, may have contributed to his death.  However, she reiterated her conclusion that "the injuries did cause his death or at least contributed to his death."

2

Andy Higdon testified that he saw Garcia at Club Westerner, a Victoria nightclub, on the night Garcia was killed. At the nightclub, Garcia introduced Higdon—using Higdon's nickname, "Lunatic"—to an unidentified male. The male responded to Higdon: "You're the one that has a problem with our home boy, Rico?" Higdon was then assaulted by several men. Garcia did not participate in the assault. When the assailants left, they shouted that they were members of the Mexican Mafia, a street gang. Higdon testified that he does not belong to a gang. He later asked Garcia why he had been assaulted, but Garcia said he did not know.

Lisa Peña testified that she and her then-husband, appellant's cousin Rolando Peña, were at Club Westerner celebrating her daughter's quinceañera on the night of the incident. Afterward, Lisa and Rolando went to Lisa's parents' home for an after-party. Appellant and Barron were also there. At around 2:00 a.m., appellant, along with Rolando and Barron, left the after-party in Rolando's white Cadillac. Appellant's girlfriend, Eina Fernandez, left in a separate car. At around 5:00 a.m., Fernandez picked Lisa up from her parents' house and drove her to Fernandez's house. Appellant, Rolando, and Barron were at Fernandez's house. According to Lisa, Rolando was intoxicated at that time and said that he had "got into some shit." The following day, Lisa drove Rolando, Barron, and appellant to Rolando's aunt's house in Corpus Christi. Lisa testified that she thinks Rolando is a member of the Mexican Mafia.

Stephanie Rendon testified that she attended the quinceañera at Club Westerner. When the club closed at around midnight, she and Barron—along with appellant, Fernandez, and Garcia—went to Fernandez's house. The group then went to La Caliente, another nightclub in Victoria. At La Caliente, Rendon saw Garcia introduce a man she knew as "Lunatic" to Barron and appellant. A fight then broke out between

3

the three men. Some time later, Rendon and Fernandez picked up Barron and appellant and took them to Lisa's parents' house. When the group arrived, appellant and Barron got out of the car to talk to Rolando, who was already there. Rolando was accompanied by a friend, Antonio Castillo. Appellant, Rolando, Barron, and Castillo then left in Rolando's white Cadillac, while Rendon and Fernandez followed in Fernandez's car. The men stopped at another nightclub, the Hideaway, where they picked up Garcia.

According to Rendon, Barron at one point got out of the Cadillac and told the women not to follow them further, but they did. At some point, the Cadillac stopped and Rolando, Castillo, and Garcia got out of the car. Rendon observed that Barron was driving, Rolando was in the front passenger seat, and appellant, Castillo, and Garcia were in the back seat, with Garcia in the middle. Barron then told the women to go home, and so she and Fernandez went back to Fernandez's house.

About an hour later, appellant, Barron, Rolando, and Castillo returned to Fernandez's house. Rendon saw that appellant and Barron had blood on their hands and shirts. The men changed clothes, and then asked Rendon and Fernandez to drive to Magic Industries, where they had left Garcia, to check on him. The two women drove to Magic Industries but could not locate Garcia, so they went back to Fernandez's house and picked up Barron. Barron pointed out where Garcia was; the group then returned to Fernandez's house to drop off Barron; and Rendon and Fernandez returned to the Magic Industries parking lot. According to Rendon, there was a "pile of blood underneath" Garcia's body. She called 911 and reported that she was driving by Magic Industries and saw a body, and she did not know if the victim was alive. Rendon and Fernandez left the scene before emergency personnel arrived. Later, Rendon saw that

4

appellant, Barron, and Rolando were in possession of Garcia's hat, telephone, and wallet. The men burned Garcia's belongings in a barbecue pit at Fernandez's house at around 4:00 or 5:00 a.m. Rendon later told police that appellant, Barron, and Rolando had told her that they had beaten Garcia up but possibly hit him too hard.

Fernandez's testimony largely corroborated that of Rendon. She testified that Barron and appellant, her then-husband, are members of the Mexican Mafia. She attended the quinceañera at Club Westerner with her daughter, appellant, Barron, and Rendon. When the club closed, the group, along with Garcia, dropped off Fernandez's daughter and went to La Caliente at around 1:00 a.m. There, Fernandez observed appellant and Barron get into an altercation with an unidentified male. Appellant and Barron were "yelling out gang signs." Afterward, Fernandez and Rendon picked up appellant and Barron outside the club and drove to Lisa's parents' house because the men wanted to talk to Rolando. According to Fernandez, appellant and Barron were "mad and upset" at the person they had fought with at La Caliente. Appellant, Barron, and Rolando left Lisa's parents' house in the white Cadillac. Fernandez and Rendon followed in their own car. Barron, driving the Cadillac, picked up Garcia at the Hideaway. The men then told Fernandez and Rendon to return home; they did so.

According to Fernandez, the group of men returned about thirty minutes later without Garcia. Appellant and Barron had blood on their clothing, and Rolando had a wallet with twenty dollars in it. Fernandez stated that Rendon put the bloody clothing in the washing machine. According to Fernandez, appellant and Barron said that they beat Garcia with their fists. Appellant then asked Fernandez to check on Garcia and take him to the hospital. Fernandez and Barron drove to the Magic Industries parking lot but could not find Garcia; they returned to Fernandez's house and picked up Barron;

5

Barron showed the women where Garcia was located; they went back to the house to drop off Barron; and the women then returned to the Magic Industries parking lot, where they found Garcia's body lying face down in a pool of blood and apparently not breathing. They called 911 and returned home without waiting for authorities to arrive.

When Fernandez and Rendon returned to the house, the men instructed them to "not say nothing." When subsequently questioned by police, Fernandez initially lied, saying that she received an anonymous call about Garcia's body. In an effort to protect appellant, Fernandez initially refused to consent to a search of her house. The next day, appellant told Fernandez that he, Barron, and Rolando were going to leave town because "of what they did." Later, Fernandez allowed police to search her home. The search turned up a burned cell phone in the barbecue pit and shoes in the washing machine.

Rolando testified that he, appellant, Barron, and Castillo were all associated with the Mexican Mafia. He stated that, on the night in question, he attended the quinceañera at Club Westerner and that Barron, Castillo, Fernandez, appellant, and Garcia were there. Rolando said that he and Lisa went to Lisa's parents' house after the party ended. Sometime later, Barron, Rendon, Fernandez, and appellant arrived at the house. Appellant and Barron told Rolando that that they had gotten into a fight at a club because Garcia had introduced them to Higdon and appellant did not like Higdon. Rolando said that appellant and Barron were still "hyped up" and wanted to fight Higdon.

Rolando stated that he, along with appellant, Barron, and Castillo, went to obtain some guns from someone known as "Juanito." At some point, Rolando received a phone call from Garcia, who was at La Caliente and asked for a ride home. The men

6

told Garcia to meet them at the Hideaway. Meanwhile, the men noticed that Fernandez and Rendon were following them in her car; Barron got out and told them to go home.

Rolando testified that, at the Hideaway, Garcia got into the middle of the back seat of the Cadillac. The men asked Garcia what had happened to Higdon after the earlier fight; Garcia said that Higdon was hit by a bottle and went to the hospital. The men asked Garcia for Higdon's address and phone number, but Garcia said he didn't know. According to Rolando, the men believed that Garcia was lying in order to protect Higdon. Appellant and Castillo, sitting on either side of Garcia in the back seat of the Cadillac, then began to punch Garcia. According to Rolando, Garcia insisted that he was not lying and he asked Rolando if he was going to "let this go down." Rolando told Barron, the driver, to pull over. Rolando intended to hit Garcia, but when he saw that Garcia was covered in blood, he "just yanked him out of there, so we could go." However, Castillo, Barron, and appellant continued to beat Garcia, who at this point was lying on the ground in the Magic Industries parking lot and was moaning from the pain. Rolando said that he initially intended to hit Garcia but changed his mind when he saw all the blood. Rolando did not see anyone take Garcia's necklace, watch, or wallet. The men got back in the Cadillac. Barron intended to run Garcia over with the car, but Rolando told him not to because he would get "stuff under the car" and they would not be able to clean it up. Rolando observed that Garcia's injuries were "major" and that it "looked like he would die if he didn't get immediate help." He did not call 911, however, because he did not want to be caught. He noted that there was a lot of blood in the car.

Rolando, Barron, and appellant hid at Rolando's aunt's house in Corpus Christi. When they were there, they cleaned the car several times with water and hydrogen peroxide. They disposed of the floor mats and seat belts. Appellant told Rolando that

7

he had taken Garcia's jewelry and tried to sell it to Rolando's aunt, but she did not want it. Six days after coming to Corpus Christi, Barron's brother came to pick the men up to take them to Mexico. As they were traveling out of town, police surrounded their vehicle and arrested them. Rolando pleaded guilty to Garcia's murder. He stated that the men didn't initially intend to kill Garcia, but that appellant and Castillo punished Garcia for failing to provide information about Higdon.

Castillo testified that he "made a stupid decision to go along with these guys." He said that Garcia was beaten up in the back seat because he did not participate in the fight at La Caliente. Castillo testified that appellant yelled, "'He didn't jump in, he didn't jump in'—You know, 'Let's fuck this dude up.'" Castillo said he "went along with them" because if he had not, he would have been next. At the Magic Industries parking lot, Barron and appellant kicked and hit Garcia in the head and face. According to Castillo, they were "putting their whole body into it" and were using "full force." At some point, Castillo and Rolando stopped beating Garcia, but Barron and appellant continued. Castillo stated that appellant and Barron pressured him into keeping quiet about the incident.

Bryan Strong, a fingerprint examiner for the Texas Department of Public Safety ("DPS"), testified that he was able to match fingerprints lifted from an ash tray in the front seat of the Cadillac to appellant. Lisa Harmon Baylor of the DPS Crime Laboratory testified that a swabbing of Garcia's ring contained a mixture including appellant's blood.

A jury convicted appellant of aggravated robbery and capital murder. This appeal followed.

## II. DISCUSSION

8

**A.     Standard of Review**

In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). When faced with conflicting evidence, we presume that the trier of fact resolved any such conflict in favor of the prosecution, and we defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

**B.     Aggravated Robbery**

By his first issue, appellant contends that the evidence was insufficient to support his conviction for aggravated robbery.[1]

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* With respect to the

---

[1] Appellant was initially indicted on one count of engaging in organized criminal activity, a first-degree felony, for which aggravated robbery was designated as the predicate offense. *See* TEX. PENAL CODE ANN. § 71.02(a)(1) (West Supp. 2011). Aggravated robbery was therefore a lesser-included offense of the indicted offense.

aggravated robbery count, such a charge would state that appellant is guilty if he: (1) intentionally, knowingly, or recklessly[2] caused bodily injury to Garcia; (2) in the course of committing theft[3] and with intent to obtain or maintain control of the property; and (3) used or exhibited a deadly weapon, namely, his hands. *See* TEX. PENAL CODE ANN. § 29.02 (West 2011); *id.* § 29.03. "In the course of committing theft" means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft. *Id.* § 29.01(1) (West 2011).

The charge permitted the jury to convict appellant either as a principal or as a party to the offense. *See id.* § 7.02(a)(2) (stating that a person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense"). The jury in this case returned a general guilty verdict; therefore, we will uphold the jury's verdict if the evidence was sufficient to support a finding either that appellant was guilty as a principal or that he was guilty as a party to the offense. *Hernandez v. State*, 198 S.W.3d 257, 261 (Tex. App.—San Antonio 2006, pet. ref'd).

Testimony by Rolando and Castillo established that appellant hit Garcia with his fists in the back seat of the Cadillac. Castillo, in particular, testified that appellant exhorted his companions to "fuck [Garcia] up" and that appellant "put[ his] whole body into" the assault and used "full force." Medical evidence established that Garcia

---

[2] A person acts intentionally when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (West 2011). A person acts knowingly when he is aware of the nature of his conduct or that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). A person acts recklessly with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Id.* § 6.03(c).

[3] Theft is defined as "unlawfully appropriat[ing] property with intent to deprive the owner of property." *Id.* § 31.03 (West Supp. 2011).

suffered bodily injury as a result of the beating. Appellant does not dispute that the jury could have reasonably concluded that his hands were "deadly weapons" within the meaning of the statute. *See* Tex. Penal Code Ann. § 1.07(a)(17)(B) (defining "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury").

Appellant's argument with respect to this issue is confined to the second element enumerated above—i.e., that the beating was done "in the course of committing theft . . . and with intent to obtain or maintain control of the property." *See id.* § 29.02. Specifically, appellant contends that there was no evidence presented "that any bodily injury to [Garcia] occurred during any theft" or that "any harm was done to [Garcia] for the purpose of committing theft." He claims that, if any theft occurred, "it could only be reasonably seen as unplanned and opportunistic, as well as after and unrelated to the assault."

Appellant is correct that the evidence showed that the items stolen from Garcia—including his wallet, cap, jewelry, and shoes—were taken immediately after, rather than before or during, the assault. He is also correct that there was no evidence establishing that the men assaulted Garcia with the express purpose of facilitating a theft. However, the robbery statute does not require that harm be done "for the purpose" of committing theft; it only requires that it be done "in the course of" committing theft. And, the Texas Court of Criminal Appeals has stated clearly that a theft occurring immediately after an assault will support an inference that the assault was intended to facilitate the theft, even if there is no other evidence of a nexus between the assault and the theft. *Cooper v. State*, 67 S.W.3d 221, 223 (Tex. Crim. App. 2002); *see McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989) (noting that the Court held "numerous times" that

11

evidence is sufficient to prove murder "in the course of" committing robbery in a capital murder case if the State proves that the robbery occurred immediately after the murder); *see also Alaniz v. State*, 147 Tex. Crim. 1, 4, 177 S.W.2d 965, 966 (1944) ("If appellant and his companions, without a previous intention to take [the victim's] money, assaulted him because of some insulting remark . . . and reduced him to a state of unconsciousness and then took his money with the fraudulent intent to appropriate it to their own use[,] the offense is robbery."). That is, an "opportunistic" theft occurring immediately after an assault will be sufficient for purposes of the robbery statute. Accordingly, even though there was no evidence that the men initiated the assault for the purpose of committing theft, the jury could have reasonably inferred that the assault occurred "in the course of" committing theft. *See Cooper*, 67 S.W.3d at 223.

Viewing all of the evidence in the light most favorable to the verdict, *see Brooks*, 323 S.W.3d at 895, we conclude that a rational jury could have found the elements of aggravated robbery beyond a reasonable doubt. Appellant's first issue is overruled.

## C.  Capital Murder

By his second issue, appellant contends the evidence was insufficient to support his conviction for capital murder. With respect to this offense, a hypothetically correct jury charge would state that appellant is guilty as alleged in the indictment if he: (1) intentionally or knowingly caused the death of Garcia; (2) in the course of kidnapping or attempting to kidnap Garcia.[4] TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011); *id.* § 19.03(a)(2). Appellant committed kidnapping if he intentionally or knowingly abducted

---

[4] The indictment contained two paragraphs alleging capital murder; the first paragraph alleged that appellant murdered Garcia while in the course of committing or attempting to commit robbery, while the second paragraph alleged that appellant murdered Garcia while in the course of committing or attempting to commit kidnapping. The jury charge, however, asked only whether or not appellant was guilty of capital murder under the theory alleged in the second paragraph of the indictment.

Garcia. *Id.* § 20.03(a). "Abduct" is defined as "to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2).

The jury was charged on the law of parties. *See id.* § 7.02(a)(2). Accordingly, appellant could be held criminally liable if, "acting with intent to promote or assist the commission of the offense, he solicit[ed], encourag[ed], direct[ed], aid[ed], or attempt[ed] to aid" either Barron, Rolando, or Castillo to commit the offense. *Id.*

Appellant contends that the evidence established "unequivocally that [Garcia] got into the car willingly and without coercion, as he had asked [appellant] for a ride home." That is true. However, the fact that a victim initially accompanies his assailants voluntarily "does not preclude the possibility that at sometime during the course of the journey . . . a murder in the course of a kidnapping subsequently occurred." *Boyle v. State*, 820 S.W.2d 122, 138 (Tex. Crim. App. 1989); *see Rodriguez v. State*, 730 S.W.2d 75, 79 (Tex. App.—Corpus Christi 1987, no pet.) ("We do not consider the fact that the victim initially accompanied appellant . . . voluntarily as precluding the possibility that a kidnapping subsequently occurred."). Here, there was evidence that, once Garcia voluntarily entered the Cadillac, he was prevented from leaving. Specifically, Rolando testified that Garcia attempted to leave the car while it was in motion, but that Castillo and appellant pulled Garcia away from the door and would not let him out. Instead, the men later dragged Garcia out of the Cadillac and savagely beat him.[5]

---

[5] Appellant notes that "regardless of whatever immediately ensued thereafter, [Garcia] was allowed to leave the vehicle as soon as was reasonable after he attempted to exit the vehicle, in a large parking lot next to a state highway in the direction of his home." It is true that the men allowed Garcia to leave the vehicle; however, it appears that they did so only because they were already in the process of beating Garcia to death. In any event, to the extent appellant is contending that he and the other assailants released Garcia in a safe place, that would be relevant only as grounds for potential mitigation of punishment in a kidnapping case. *See id.* § 20.04(d) ("At the punishment stage of a trial, the defendant

13

Viewed in the light most favorable to the verdict, the evidence supported a finding that appellant intentionally or knowingly restrained Garcia with intent to prevent his liberation by using or threatening to use deadly force. *See* TEX. PENAL CODE ANN. § 20.01(2) (defining "abduct"). Moreover, the evidence supported a finding that appellant, either as a principal or as a party, intentionally or knowingly caused Garcia's death in the course of doing so. *See id.* § 19.03(a)(2). Appellant's second issue is overruled.

## III. CONCLUSION

We affirm the judgment of the trial court.

DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)

Delivered and filed the
3rd day of January, 2013.

---

may raise the issue as to whether he voluntarily released the victim in a safe place. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree."). It is not relevant in this case.