

NUMBER 13-14-00043-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ISAAC PAUL MILNE,                                                          Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

## On appeal from the 18th District Court of
## Johnson County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Longoria**
**Memorandum Opinion by Justice Garza**

A jury convicted appellant Isaac Paul Milne of felony capital murder.  *See* TEX.

PENAL CODE ANN. § 19.03(a)(2), (b) (West, Westlaw through 2013 3d C.S.).  The trial court

assessed the mandatory sentence of life without parole.  *See id.* § 12.31(a)(2) (West,

Westlaw through 2013 3d C.S.). By two issues, appellant contends: (1) the evidence was insufficient to support his conviction; and (2) the trial court erred in admitting certain prejudicial photographs of the decedent. We affirm.

## I. BACKGROUND[1]

Testimony at trial established the following facts. In the early morning hours of September 21, 2011, Jessica Cryer, then a 911 dispatcher for the Johnson County Sheriff's Office, received a 911 call from Michelle Adams. Adams reported that her brother, Rick Warren, had been robbed and was lying unconscious on the floor of his mobile home. Warren's mobile home was located near the home Adams shared with James Hammond. The property was in a rural area near Rio Vista, Texas.

Jonathan Poole, an officer with the Johnson County Sheriff's Department, and several deputies responded to the dispatch call. Officer Poole observed a brick house on the property and a mobile home located approximately twenty-five yards from the house. Adams led Officer Poole to Warren's bedroom in the mobile home; Warren's severely beaten and lifeless body was on the floor next to his bed. Blood was spattered on the bed, floor, and surrounding area. Adams informed Officer Poole that a television, a laptop, and a guitar were missing from the mobile home.

Adams testified that Warren, who was forty-eight, had suffered three strokes. Adams often helped him with meals and kept him company. On the night of the murder, Adams had stayed at the mobile home with Warren watching television until about eleven or midnight. She returned home and went to bed, but was awakened several hours later

---

[1] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

2

by the dog barking. Adams ran outside and noticed someone inside Warren's vehicle. Adams ran to Warren's back door, which had been kicked down from the inside. She saw two figures running away. Adams stepped inside and saw Warren face down on the bedroom floor in a puddle of blood. Adams called 911, and she and James attempted to perform CPR on Warren.

Adams told the officers that she suspected that the intruders were Jenny Sue Davis and her boyfriend, whose nickname was "Bounce." Adams believed that "Bounce" was associated with the Aryan Brotherhood. After consulting a database of street names, law enforcement officers identified "Bounce" as Jeremy Bukowski. Warren had permitted Davis and Bukowski to stay in an extra bedroom in his mobile home. However, several days before the murder, Warren had asked them to leave because he suspected they were stealing from him. Shortly before Bukowski and Davis were asked to leave, Adams also discovered that several other men, all with the same tattoos, had been staying in the extra bedroom. Bukowski told Adams that he had to kill one more person in order to be a full-fledged member of the Aryan Brotherhood. Davis told Adams that she and Warren were an "easy target" living in the rural area. Davis also threatened to hit Adams with a hammer.

Cindy McGuire, an investigator with the Johnson County Sheriff's Office, testified that Bukowski consented to a search of his vehicle, where Warren's laptop computer was found. McGuire also assisted in the search of Bukowski's RV, where Warren's television and guitar were recovered. Several items were also found in a tub in the RV, including a pair of gloves and some clothing wrapped around a hammer and a crescent wrench.

Leona Yocham, an investigator with the Johnson County Sheriff's Department,

3

testified that the investigation of the murder focused on three people: Bukowski, appellant, and Nico Cogdill. Appellant was taken into custody the day after the murder. Yocham was present during appellant's first custodial interview and testified that appellant signed a written statement after the interview. In the statement, appellant stated that the plan was to drive to Warren's home where Nico and Bukowski would enter and "get what was worth it." Appellant was to stay in the car and meet them when they returned. Nico took a gun when he got out of the car and Bukowski took appellant's crescent wrench. When they returned to the car, Nico was carrying the shotgun and a flat-screen television. Bukowski was carrying the laptop and a guitar. Appellant asked about the crescent wrench, which had been left inside the mobile home. Appellant asked Bukowski to come with him to retrieve the wrench. Bukowski picked up the wrench from the kitchen. Appellant asked what else they could take, and Bukowski told him to check the computer room. Appellant went to the computer room. When appellant walked into the bedroom, Bukowski was beating Warren with the wrench until appellant "saw [Warren's] skull cave in." Appellant stated that he did not tell Bukowski to stop because Bukowski was "a made bro" and appellant was only a "prospect" with the Aryan Brotherhood. Appellant stated that he was "afraid" of what would happen if he refused or said anything to Bukowski. When appellant and Bukowski heard Adams screaming, appellant kicked down the back door and ran through the field. The three drove to Carolyn Harris's home in Alvarado, Texas and then to Bukowski's RV. They unloaded the stolen items, the bloody clothing, and the wrench into Bukowski's RV.

Don Stoner, a Texas Ranger with the Department of Public Safety, testified that he interviewed Bukowski the morning after the murder. Bukowski named appellant and

4

Cogdill as additional suspects in the crime. Appellant, whose nickname is "Rooster," was identified in a photo lineup by Bukowski and was arrested a couple of days after the murder. Cogdill, whose nickname was "Bamm," was also arrested a couple of days after the murder. Stoner participated in interviews of each of the defendants. According to Stoner, each defendant implicated the other two and minimized his own participation. Appellant was first interviewed on September 22, 2011. Stoner and Investigator Yocham participated in the interview. Stoner said that subsequent interviews of appellant were done at appellant's request. Appellant was interviewed by another officer on September 25. Stoner participated in another interview of appellant on September 26 and again on September 27. On each occasion, appellant was advised of his rights. Appellant's account of events, and his characterization of his own involvement, changed over the several interviews.

In the September 22 interview, appellant stated he was a "prospect" with the Aryan Brotherhood. In the September 26 interview, however, he denied any involvement with the Aryan Brotherhood. There were other inconsistencies in appellant's interviews. In the September 26 interview, appellant said he drove Bukowski to Warren's home so Bukowski could pick up some of his belongings that had been left at the home. Later, however, appellant stated that he, Bukowski, and Cogdill planned the burglary, and that "Richie Rich", an Aryan Brotherhood member, knew of the plan. In the September 27 interview, appellant admitted for the first time that he hit Warren with the crescent wrench. Appellant stated that Warren was still alive when he hit him with the wrench.

Dr. Gary Sisler, a retired pathologist trained in forensic medicine, testified that he performed an autopsy on Warren's body. Dr. Sisler stated that the cause of Warren's

5

death was blunt trauma of the head and brain. The injuries to the back of Warren's head extended into the brain. Warren's skull was "fractured into many parts" and was "driven into the brain, caus[ing] lacerations of the brain with fragmentation of brain tissue." According to Dr. Sisler, "the extensive damage to the brain tissue . . . cause[d] almost immediate death."

Carolyn Van Winkle, a forensic scientist from the Tarrant County medical examiner's office, testified regarding DNA evidence related to the murder. Among other items found in the tub in Bukowski's RV, Van Winkle tested blood stains found on the crescent wrench; the stains were consistent with Warren's DNA. Van Winkle also tested DNA on a white tank top found in the tub; the DNA was consistent with appellant's DNA.

The State rested. Appellant testified on his own behalf. Appellant testified that on the night of September 20, he and Cogdill were at Carolyn Harris's house and Bukowski was there also. Appellant had known Cogdill for a couple of weeks and had met Bukowski about a week before the murder. Bukowski asked appellant for a ride to pick up some of his belongings. Appellant initially refused, but agreed after a "guy named Richie" asked him to give Bukowski a ride. Appellant said there was no discussion about robbing Warren. Appellant denied knowing that Cogdill and Bukowski brought gloves or weapons. When they arrived at the property, Cogdill and Bukowski got out and took the wrench. Appellant remained in the car. Bukowski and Cogdill were in the mobile home approximately ten minutes. When they returned, appellant noticed they had gloves on. When appellant asked what happened, they said they had beaten Warren. Appellant asked about his wrench. Bukowski said they had left it inside. Appellant and Bukowski went back inside the mobile home. Bukowski told appellant to check the computer room

6

for a modem. Bukowski went back to the bedroom. Appellant saw Warren on the floor and Bukowski standing over him. Appellant said that Bukowski demanded that he "be a part of it" so he would not "call and snitch" on Bukowski and Cogdill. Bukowski told appellant, "you do it or you can stay here." Appellant interpreted this as a threat: either do as he was told or Bukowski would beat him also. Appellant testified that he feared Bukowski and the Aryan Brotherhood because Bukowski was a member of the gang. Appellant admitted that he hit Warren, but did so only because he was threatened by Bukowski. Appellant testified that he was given the nickname "Rooster" when he was young. He denied being a prospect of the Aryan Brotherhood.

On cross-examination, appellant admitted that in his first three interviews, he denied that he had participated in beating Warren. In his last interview, however, he admitted that he hit Warren because Bukowski threatened him. Appellant admitted that Warren was still alive when he hit him in the face with the wrench. Appellant also admitted that "Richie Rich" was a member of the Aryan Brotherhood. Appellant admitted that he was aware that Bukowski and Cogdill had brought a shotgun along on the trip to Warren's property, but denied knowing they planned to rob Warren. Appellant testified that he had twice before been convicted of theft.

Appellant also admitted that while in jail awaiting trial, he wrote a letter to his then-wife, in which he admitted that he, Cogdill, and Bukowski went to Warren's property with the plan of robbing him and beating him. The letter said that Bukowski "knew this guy we could rob for some stuff and if we wanted beat him up." After Bukowski told appellant that the target was a child molester, appellant agreed to "go beat his ass." The letter stated that all three entered Warren's mobile home and that Cogdill and appellant started

7

beating Warren. The letter stated that when appellant started to leave, Bukowski threatened appellant with a shotgun. At trial, appellant testified that the events as recounted in the letter were not true, but he wrote the letter in an effort to make Cogdill appear more sympathetic. Appellant was also questioned about statements he made in an earlier interview, in which he said that, the day after the murder, he and Cogdill were asked by Aryan Brotherhood members to kidnap Bukowski and deliver him for questioning.

The jury charge authorized the jury to convict appellant of capital murder as a principal, a party, or a conspirator under the law of parties. The jury was also instructed on the affirmative defense of duress.

The jury found appellant guilty of capital murder, and the trial court imposed a sentence of life imprisonment.

## II. SUFFICIENCY OF THE EVIDENCE

By his first issue, appellant contends the evidence is insufficient to support his conviction. Specifically, appellant contends that the State failed to prove that he intended to cause Warren's death or that he struck the fatal blow. Although appellant admitted striking Warren in the face with the wrench, appellant argued that he was under duress when he did so because his life was threatened by Bukowski.

### A. Standard of Review and Applicable Law

In a sufficiency review, courts examine the evidence in the light most favorable to the verdict to determine whether "any rational fact finder could have found guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plural. op.) ("[T]he *Jackson* legal-sufficiency

8

standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.").  This standard requires reviewing courts to resolve any evidentiary inconsistencies in favor of the judgment, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony.  *Brooks,* 323 S.W.3d at 899; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West, Westlaw through 2013 3d C.S.) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony. . . .").  Appellate courts do not re-evaluate the weight and credibility of the evidence; they only ensure that the fact finder reached a rational decision.  *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009).  A fact finder may support its verdict with reasonable inferences drawn from the evidence, and it is up to the fact finder to decide which inference is most reasonable.  *Id.* at 523.

A person commits capital murder if he intentionally or knowingly causes the death of an individual and intentionally commits the murder in the course of committing or attempting to commit, among other things, burglary or robbery.  *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West, Westlaw through 2013 3d C.S.); *id.* § 19.03(a)(2) (West, Westlaw through 2013 3d C.S.).  Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."  *See id.* § 7.01(a) (West, Westlaw through 2013 3d C.S.).  "A person is criminally responsible for an offense committed by the conduct of another if: . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the

9

other person to commit the offense."  *Id.* § 7.02(a)(2) (West, Westlaw through 2013 3d

C.S.).  A person is also "criminally responsible" for an offense committed by the conduct

of another if:

> in the attempt to carry out a conspiracy to commit one felony, another felony
> is committed by one of the conspirators, all conspirators are guilty of the
> felony actually committed, though having no intent to commit it, if the
> offense was committed in furtherance of the unlawful purpose and was one
> that should have been anticipated as a result of the carrying out of the
> conspiracy.

*Id.* § 7.02(b) (West, Westlaw through 2013 3d C.S.)).

"Evidence is sufficient to convict under the law of parties where the accused is

physically present at the commission of the offense and encourages its commission by

words or other agreement."  *Hernandez v. State*, 198 S.W.3d 257, 261 (Tex. App.—San

Antonio 2006, pet. ref'd).  "In determining whether an accused participated as a party, the

fact finder may examine the events occurring before, during, and after the commission of

the offense and may rely on actions of the accused that show an understanding and

common design to commit the offense."  *Id.*  "Further, circumstantial evidence may be

used to prove party status."  *Id.*

Here, the jury was instructed that it could find appellant guilty of capital murder (1)

as a principal; (2) as a party under penal code section 7.02(a)(2); or (3) as a co-

conspirator under penal code section 7.02(b).  *See* TEX. PENAL CODE ANN. § 7.02(a)(2),

(b).  The jury returned a general guilty verdict; therefore, if the evidence is sufficient to

support a guilty finding under any of the allegations submitted, we must uphold the jury's

verdict.  *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

Sufficiency of the evidence is measured by the elements of the offense as defined

by a hypothetically correct jury charge.  *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex.

10

Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *see Malik*, 953 S.W.2d at 240. As authorized by the indictment in this case, the State was required to show that appellant (1) intentionally (2) caused Warren's death (3) by hitting him with a wrench (4) while appellant was in the course of committing or attempting to commit either (a) the offense of robbery of Warren or (b) the offense of burglary of Warren's habitation. The charge authorized appellant's conviction if the jury found that he caused Warren's death by acting as a principal, a party, or a participant in a conspiracy.

"A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West, Westlaw through 2013 3d C.S.). Murder is a "result of conduct" offense. *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). "That is, the accused must have intended the result, death, or have been aware that his conduct was reasonably certain to cause that result." *Guzman v. State*, 20 S.W.3d 237, 240 (Tex. App.—Dallas 2000), *rev'd on other grounds*, 85 S.W.3d 242 (Tex. Crim. App. 2002).

It is not necessary that the evidence directly proves the defendant's guilt; "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Kuciemba v. State*, 310 S.W.3d 460,

11

462 (Tex. Crim. App. 2010). A defendant's intent, in particular, may be inferred from his words, acts, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In other words, intent and knowledge are fact questions and are almost always proven through evidence of the circumstances surrounding the crime. *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984). Both the identity of the accused and the corpus delicti of an offense may be proven by circumstantial evidence. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *see also Wheeler v. State*, 35 S.W.3d 126, 134 (Tex. App.—Texarkana 2000, pet. ref'd); *Clark v. State*, No. 13–10–00496–CR, 2011 WL 3821055, at *4 (Tex. App.—Corpus Christi Aug. 25, 2011, no pet.) (mem. op., not designated for publication).

A defendant's extrajudicial confession alone is not sufficient to support a conviction. *Williams v. State*, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997); *In re C.P.*, 998 S.W.2d 703, 709 (Tex. App.—Waco 1999, no pet.). There must be other evidence independent of the confession that tends to prove the corpus delicti. *Williams*, 958 S.W.2d at 190; *In re C.P.*, 998 S.W.2d at 709. The independent evidence of the corpus delicti does not need to connect the defendant to the crime, be sufficient by itself to prove the crime, nor be a great quantum of evidence; it only needs to be some evidence which renders the corpus delicti more probable than it would be without the evidence. *Williams*, 958 S.W.2d at 190; *In re C.P.*, 998 S.W.2d at 709–10.

"Duress is an affirmative defense requiring the defendant to prove by a preponderance of the evidence that he committed the offense 'because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another.'" *Guia v. State*, 220 S.W.3d 197, 205 (Tex. App.—Dallas 2007, pet. ref'd) (quoting TEX. PENAL

12

CODE ANN. § 8.05(a) (West, Westlaw through 2013 3d C.S.)). "To establish compulsion, a defendant must prove that 'the force or threat of force rendered a person of reasonable firmness incapable of resisting the pressure.'" *Id.* (quoting TEX. PENAL CODE ANN. § 8.05(c) (West, Westlaw through 2013 3d C.S.)). The defense of duress is unavailable if a defendant "intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that he would be subjected to compulsion." *See* TEX. PENAL CODE ANN. § 8.05(d) (West, Westlaw through 2013 3d C.S.).

Appellant argued that he "proved by a preponderance of the evidence that he was under duress" when the murder was committed. We construe appellant's argument as a challenge to the legal and factual sufficiency of the evidence supporting the jury's rejection of his duress defense.

A challenge to the sufficiency of the evidence to support a finding on an issue for which the defendant has the burden of proof may be made on legal or factual sufficiency grounds. *See Matlock v. State*, 392 S.W.3d 662, 670 (Tex. Crim. App. 2013). In evaluating whether there is legally insufficient evidence to support the finding, we first search the record for evidence favorable to the finding, disregarding all contrary evidence unless a reasonable fact-finder could not. *Id.* at 669. If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law. *Id.* In evaluating factual sufficiency, we consider the entire body of evidence in a neutral light to determine whether the finding on the affirmative defense was so "against the great weight and preponderance" of the evidence as to be manifestly unjust. *Id.* at 671.

**B. Discussion**

13

Under both standards, we conclude that the evidence is sufficient to overcome appellant's affirmative defense of duress. Appellant's own trial testimony established that Warren was alive when appellant hit him in the face with the wrench. Although appellant claimed that he only hit Warren because he was threatened by Bukowski, the jury was free to accept or reject appellant's claim that he was threatened.[2] *See Anderson v. State*, 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) ("The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony"). In the letter appellant wrote to his then-wife, appellant admitted that he, Cogdill, and Bukowski went to Warren's property with the plan of robbing him and beating him. In the letter, appellant admitted that all three men initially went inside and that he and Cogdill beat Warren. Although appellant denied this version of events at trial, the jury was free to believe it. *See id.* Appellant also admitted at trial that he knew Bukowski and Cogdill had brought a shotgun along on the trip to Warren's property, but denied knowing that they planned to rob Warren.

In appellant's September 22, 2011 written statement, he admitted that he, Cogdill, and Bukowski planned to rob Warren. In the statement, appellant stated that Bukowski was a "made bro" in the Aryan Brotherhood and was "over" appellant, who was "just a prospect." In later interviews and at trial, appellant denied being in the Aryan Brotherhood. He admitted at trial, however, that the day following the murder, he was asked to assist in a plan to kidnap Bukowski at the request of some Aryan Brotherhood

---

[2] We note that appellant's credibility was undermined by the various versions of events that he related in his interviews. In his September 22 interview and his interview on September 26, appellant denied that he hit Warren. In his September 27 interview and at trial, appellant admitted that he hit Warren, but did so only out of fear of Bukowski. A defendant's inconsistent statements are probative of guilt. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

14

members. Appellant also told Adams that as a "prospect" in the Aryan Brotherhood, he was required to kill one more person to become a full-fledged member of the organization. The jury was free to resolve these conflicts by believing that appellant was a "prospect" with the Aryan Brotherhood, which provided him with an additional motive to participate in the murder. *See id.*

Evidence corroborating the testimony that appellant participated in the murder included appellant's DNA on a shirt that was found, along with the bloody wrench and other clothing, in a tub at Bukowski's RV.

Moreover, the letter appellant wrote to his then-wife and his trial testimony established appellant's guilt as a party to Warren's murder. As noted, the jury was free to reject appellant's claim that he only hit Warren because he was threatened by Bukowski. *See id.* Appellant's duress claim was also undermined by his admission that, on the day after the murder, he was willing to assist in kidnapping Bukowski at the request of several Aryan Brotherhood members. This suggests that appellant was more motivated by a desire to appease Aryan Brotherhood members than by fear of Bukowski. We hold the evidence was sufficient to support the jury's finding against appellant's affirmative defense of duress. *See Matlock*, 392 S.W.3d at 669–71. We conclude that the jury was rationally justified in finding appellant guilty beyond a reasonable doubt as a principal or as a party. We overrule appellant's first issue.

### III. ADMISSION OF PHOTOGRAPHS

By his second issue, appellant contends that the trial court erred in admitting certain photographs of Warren's body taken at the crime scene and during the autopsy. Specifically, appellant argues that admission of State's Exhibits Nos. 9, 11, 12, 13, 18,

15

66, and 81 through 88 was improper because the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. *See* Tᴇx. R. Eᴠɪᴅ. 403. Appellant complained that the photographs were "duplicitous [sic] with other photos" and offered "for the sole purpose of inflaming the minds of the jurors."

### A. Standard of Review and Applicable Law

We review a trial court's decisions on evidence admissibility under an abuse-of-discretion standard, reversing only when the trial court's decision falls outside the zone of reasonable disagreement. *See Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006); *see also Bailey v. State*, No. 10-11-00437-CR, 2012 WL 4841465, at *3 (Tex. App.—Waco Oct. 11, 2012, no pet.) (mem. op., not designated for publication). Rule 403 provides that: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tᴇx. R. Eᴠɪᴅ. 403.

> A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or in black and white, whether they are close-up and whether the body depicted is clothed or naked. A court, however, should not be limited to this list. The availability of other means of proof and the circumstances unique to each individual case should also be noted.
>
> In addition, autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. Changes rendered by the autopsy process are of minor significance if the disturbing nature of the photograph is primarily due to the injuries caused by the appellant.

*Hayes v. State*, 85 S.W.3d 809, 815–16 (Tex. Crim. App. 2002) (internal citations omitted). "Ultimately, the admissibility of the challenged photograph is within the sound

16

discretion of the trial court." *Aragon v. State*, 229 S.W.3d 716, 724 (Tex. App.—San Antonio 2007, no pet.).

### B. Discussion

We first address State's Exhibits 9, 11, 12, 13 and 18. Those photographs were admitted during the testimony of Officer Poole. When appellant's counsel objected, the prosecutor responded that "[t]hose are actual first responder views of exactly what [Officer Poole] saw on the scene." Exhibit 9 depicts Warren's body lying on the floor in a pool of blood next to the bed. The photograph shows blood stains on the sheets and blood spatter on nearby items. Exhibit 11 shows a close-up of Warren's bloody head and torso in the same pose next to the bed. Warren's face is covered in blood. Exhibit 12 is an extreme close-up of Warren's bloody face and hair; open wounds on Warren's face are visible. Exhibit 13 shows Warren's entire body lying next to the bed. Exhibit 18 is a close-up photograph of a blood-soaked hole in the back of Warren's skull.

These photographs depicted the severity of Warren's injuries, the cause of death, the location of the body next to the bed, and suggested that Warren was beaten while in the bed and on the floor. Blood spatter on surrounding items showed that the blows were inflicted in the vicinity where the body was found. The close-up photographs of Warren's face and the back of his head show wounds consistent with being beaten with a crescent wrench. Each of the photographs was taken from a different angle or different distance from the body. Although the photographs are disturbing, they depict "nothing more than the reality of the crime committed." *See id.*

Exhibit 66 is a close-up of Warren's blood-covered face. Exhibit 66 was admitted during the testimony of Officer Michael Gaudet, an investigator with the Johnson County

17

Sherriff's Office. Similar to Exhibit 12, Exhibit 66 shows the severity of the wounds on Warren's face. We conclude that Exhibits 9, 11, 12, 13, 18, and 66 were probative and that any danger of unfair prejudice did not substantially outweigh the probative value of the photographs. We hold that the trial court did not abuse its discretion in admitting the photographs.

Appellant also complains of the admission of autopsy photographs, State's Exhibits 81 through 88. The autopsy photographs were admitted during the testimony of Dr. Sisler. Dr. Sisler testified that Warren suffered seventeen blunt force injuries to the face and head. He testified that one of the most serious injuries was to the back of the head. Exhibits 81 through 85 show close-ups of Warren's face and shaven head. Exhibit 81 shows a frontal view of Warren's face; severe wounds to his cheek, chin, and temple are visible. Exhibit 82 shows the right side of Warren's face and head; severe wounds to his cheek and head are visible. Exhibit 83 shows the left side of Warren's face and head; multiple lacerations to his cheek, temple, and head are visible. Exhibit 84 is a close-up of the left side of Warren's face. The photograph depicts the depth and severity of the wounds. Exhibit 85 shows the back of Warren's head. The photograph shows multiple lacerations and fractures to the skull. A large gaping hole in Warren's skull is visible. Dr. Sisler described the photograph as showing "brain, scalp and bone protruding from the open wound." Exhibits 86 through 88 show "defensive wounds." Exhibit 86 shows a close-up of a laceration to the thumb, 87 shows a laceration to the hand, and 88 shows a laceration to the arm.

Dr. Sisler explained that the cause of death was "destruction of the brain." He stated that "with the extensive damage to the brain tissue, it would cause almost

immediate death." The autopsy photographs are probative of the severity of Warren's injuries and the cause of death. We conclude that any danger of unfair prejudice did not substantially outweigh the probative value of State's Exhibits 81 through 88. The trial court did not abuse its discretion in admitting the photographs. We overrule appellant's second issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
20th day of November, 2014.